William E. GARDNER, Petitioner-Respondent,

v.

Dianne K. GARDNER, Respondent-Appellant.†

Court of Appeals

*No. 94–0141. Submitted on briefs September 30, 1994.—Decided December 14, 1994.*

(Also reported in 527 N.W.2d 701.)

†Petition to review denied.

224

On behalf of the respondent-appellant, the cause was submitted on the briefs of *John A. Fiorenza* and *Jeffrey M. Leggett* of *Fiorenza & Hayes, S.C.* of Milwaukee.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Anne Willis Reed* and *David G. Hanson* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.* of Milwaukee.

Before Anderson, P.J., Brown and Nettesheim, JJ.

ANDERSON, P.J. Dianne K. Gardner appeals from a divorce judgment which found a marital property agreement to be procedurally and substantively fair, which found under the terms of the agreement that William E. Gardner retained sole interest in the parties' principal residence and which found under the agreement that Dianne was not entitled to a portion of the funds deposited by William in the parties' joint checking account and paid out to satisfy William's per-

sonal obligations. Dianne also contends that the trial court erred when it found that William did not fraudulently induce her to part with an ownership interest in a joint business venture. Finally, Dianne challenges the trial court's ruling finding her claims involving the joint business venture and the joint checking account were frivolous and imposing nominal attorney's fees.

We affirm the judgment of the trial court. We conclude that the marital property agreement satisfies the procedural and substantive fairness requirements of the law. The terms of the agreement are plain and straightforward and the trial court did not err in awarding the Slinger residence to William. Further, we determine that the terms of the agreement do not subject William's separate property, deposited in a joint checking account solely for the purpose of paying William's separate obligations, to division at the time of a divorce.

There is substantial and credible evidence to support the finding that Dianne was not fraudulently induced into parting with an ownership interest in a joint business venture. Finally, we independently conclude that several claims Dianne pursued during the proceedings were frivolous and sustain the trial court's award of nominal attorney's fees.

## I. Marital Property Agreement

### A. Validity

Marital property agreements (MPA) are recognized as essential in many interpersonal relationships; in divorce actions the trial court must consider the existence of any written MPA:

> Any written agreement made by the parties before or during the marriage concerning any arrangement for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

Section 767.255(11), STATS. The law is well settled that a marital property agreement is equitable if it satisfies all of the following requirements:

*Procedural Fairness:*

1. Each spouse made fair and reasonable disclosure to the other of his or her financial status;

2. Each spouse has entered into the agreement voluntarily and freely; and

*Substantive Fairness:*

3. The substantive provisions of the MPA dividing the property upon divorce are fair to each party.

*Greenwald v. Greenwald,* 154 Wis. 2d 767, 779-80, 454 N.W.2d 34, 38 (Ct. App. 1990). If an MPA fails to meet any one of these requirements it must be invalidated.

The law presumes marital property agreements are equitable. *Id.* at 784, 454 N.W.2d at 40. The determination of whether an MPA is equitable requires the exercise of discretion by the trial court. *Id.* at 780, 454 N.W.2d at 38. On appeal, we affirm the determination of the trial court if it considered the relevant law and facts and set forth a process of logical reasoning. *See id.*

229

During our review we are obligated to accept the trial court's resolution of the credibility of the witnesses because of the court's superior opportunity to judge such matters. *Id.* at 781, 454 N.W.2d at 39.

Dianne disputes all three requirements. First, she charges William with failing to fairly disclose the actual value of his major asset. Second, she insists that the imminent wedding, with all of the accompanying plans, left her no choice but to sign the MPA three days before the wedding. Finally, Dianne asserts her payout of $200,000 under the MPA is substantively unfair because it does not take into account her contributions to the prosperity of the marriage. Because Dianne is challenging the MPA, she has the burden of persuasion and production of evidence to overcome the statutory presumption that the MPA is equitable. *See id.* at 784, 454 N.W.2d at 40.

### 1. PROCEDURAL FAIRNESS

William and Dianne began dating in 1983; Dianne had been married three times before and William had been married once before. When they started to talk about marriage in 1985, William told Dianne he would not consider marriage unless they reached a written agreement protecting his property. William was the sole shareholder of Gardner Bender, Inc., with a substantial income and assets. Dianne was a waitress with minimal income and assets.

Beginning in June 1985, William discussed an MPA with his attorney who then drafted a proposal. As part of the proposal, a schedule of William's assets was attached. William's major asset, stock in Gardner Bender, Inc., was listed with a value of $2,045,000 but included a footnote: "Value as shown represents book value. Market value may be substantially higher." Wil-

liam's total assets were in excess of $3,000,000. Another addendum listed Dianne's assets at $22,000. Dianne retained separate counsel and several drafts of the MPA were exchanged during negotiations. The negotiations resulted in a substantial increase in the cash William was to pay to Dianne in the event of termination of the marriage by divorce or separation.

Dianne complains that this disclosure was not a "fair and reasonable" disclosure. Based upon testimony of her expert witness, she contends that the stock's fair market value in 1985 was in the vicinity of $18,000,000 to $20,000,000. Dianne argues that William had the duty to provide a fair and reasonable disclosure and she had no duty to seek out additional information about the stock.

The trial court correctly noted Dianne's attorney had a background in accounting and he had carefully explained the difference between book value and fair market value to Dianne. Based on the attorney's testimony, the court was satisfied that Dianne understood the valuation methods of stock and was content with the disclosure. The court observed that Dianne's attorney made the professional judgment that it was unnecessary to seek an independent appraisal of the company. The trial court also found that Dianne's attorney told her the agreement was not in her best interest and advised her not to sign it. All of these findings are amply supported by the record and, in and of themselves, support the conclusion that the disclosure made by William was fair and reasonable.

We agree with the trial court's conclusion that the dollar value placed on the stock was of no significance to Dianne. Dianne was determined to marry William.

This determination to marry overcame her attorney's advice that the MPA was not in her best interest and his advice not to sign the agreement. Dianne herself testified that the value of William's assets was not important to her. "The purpose of a fair and reasonable disclosure is to guard against the possibility that '[a] party might not have entered into the agreement had she or he known the facts.' " *Id.* at 782, 454 N.W.2d at 39 (quoting *Button v. Button,* 131 Wis. 2d 84, 95, 388 N.W.2d 546, 550 (1986)). Dianne's conduct demonstrates that specific knowledge of William's assets and finances was not an important component of her decision to marry William.

Dianne's other assault on the procedural fairness of the MPA is her contention that she did not have adequate time to review the agreement. As she must, Dianne concedes that she was represented by independent counsel, understood the terms of the agreement and their affect, and understood her financial rights in the absence of an MPA. *See Button,* 131 Wis. 2d at 95-96, 388 N.W.2d at 551. She argues that with a wedding pending she did not have time to adequately consider the agreement when the final draft was submitted to her five days before the wedding.

In June 1985, William told Dianne he would not marry her until they reached an agreement that would protect his separate property. After William made this statement, Dianne began to tell her friends that she and William were to be married and she started to plan an October wedding. As she was planning the wedding she was also negotiating the MPA, she had independent counsel and she attended two counseling sessions devoted to the MPA. Dianne and her attorney received a draft of the MPA in early August 1985. During subsequent negotiations, Dianne was successful in getting

the MPA revised several times until she had doubled her payout in the event of divorce.

We conclude that Dianne had a "meaningful choice." *Greenwald*, 154 Wis. 2d at 782, 454 N.W.2d at 39. There is no evidence to support a conclusion that Dianne was coerced, rushed or, in any manner, forced to sign the MPA. Dianne was resolved in her decision to marry William. Any pressure to sign the MPA arose from her resolve and not from William. In reaching this same conclusion, the trial court commented that Dianne's testimony on many key points was less than credible. We must give due deference to this finding. *Id.* at 783, 454 N.W.2d at 40.

A party's statement requiring an MPA as a condition of marriage is not coercion. The other party is free to leave the relationship if an agreement is objectionable. The insistence that an MPA be signed before a marriage to protect the proposing party's substantial property and preserve it for his or her lineal heirs is not a threat. As we wrote in *Greenwald*, a marital property agreement serves "a useful function by allowing the parties to structure their financial affairs to suit their needs and values and to achieve certainty. The right to enter into an agreement regulating financial affairs in a marriage is important to a large number of citizens." *Id.* at 784-85, 454 N.W.2d at 40 (citation omitted).

### 2. SUBSTANTIVE FAIRNESS

Dianne does not fully develop her argument concerning the substantive unfairness of the agreement other than to point out the disproportionate amount of property William was awarded under the terms of the MPA and the trial court's decision. She fails to present

any argument that the agreement was either unfair at the time it was signed or at the time of the divorce.

At trial she failed to carry her burden of proof on the existence of the factors to be considered in reviewing substantive fairness:

> These include the objectives of the parties in executing the agreement, the economic circumstances of the parties, the property brought to the marriage by each party, each spouse's family relationships and obligations to persons other than the spouse, the earning capacity of each person, the anticipated contribution by one party to the education, training or increased earning power of the other, the future needs of the respective spouses, the age and physical and emotional health of the parties, and the expected contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.

*Id.* at 785, 454 N.W.2d at 41. Dianne did come forward with evidence of some of the factual factors that must be considered; however, she failed to persuade the trial court that the evidence she produced supported the factual proposition she needed to establish: the marital property agreement was substantively unfair. *See* DANIEL D. BLINKA, WISCONSIN PRACTICE: EVIDENCE § 301.1, at 46-47 (1991).

Substantive unfairness can exist at the time the parties bargain for the agreement or at the time of the divorce. Dianne failed to carry her burden that the parties bargained from unequal positions. Her desire to marry does not lessen her bargaining position. Substantive unfairness at the divorce is not proven by a

side-by-side comparison of the property each party received when the marriage was terminated. "An agreement is not unfair at divorce just because the application of the agreement results in a property division which is not equal between the parties . . .." *Greenwald*, 154 Wis. 2d at 787, 454 N.W.2d at 41-42.

In summary, we conclude that the trial court accurately and faithfully exercised its discretion when it held that the marital property agreement was procedurally and substantively equitable. We join in the trial court's comment, "Any other ruling would, in effect, say that no Agreement of this type would ever be valid."

## B. JOINT CHECKING ACCOUNT

After their marriage Dianne and William established a joint checking account. During the marriage William deposited $2,008,410.60 in the joint account and used all of those funds to pay his personal obligations. Dianne sought reimbursement of one-half of these funds. Dianne uses the marital property agreement, the Wisconsin Uniform Marital Property Act (WUMPA), ch. 766, STATS., and the theory of transmutation to support her argument. The trial court held, "This is the most imaginative issue raised by counsel on behalf of Dianne. After reading the brief, hearing the evidence, seeing the exhibit, and listening to the oral argument, I still have difficulty finding any merit in this issue."

Whether Dianne is entitled to a portion of the individual property William deposited in the joint checking account and used to pay his individual obligations is a property division issue. Division of property at the dis-

solution of a marriage is a discretionary act for the trial court. The court of appeals will not interfere with a trial court's division of property unless there has been a misuse of discretion. *See Kuhlman v. Kuhlman,* 146 Wis. 2d 588, 590, 432 N.W.2d 295, 296 (Ct. App. 1988).

On appeal, Dianne concedes that the MPA provided that each party was to pay his or her individual obligations from his or her individual property. Dianne contends that William's deposit of his individual property into the joint checking account changed the character and identity of that property into joint property. She argues that William's payment of his individual obligations from joint property entitles her to reimbursement for her share of the joint property.

To support her argument Dianne, first turns to a series of property division cases which establish the concept of "transmutation" of gifted or inherited property into joint property.[1] These cases are not applicable because none speaks to separate property obtained by means other than gift or inheritance; by their very terms they are limited to cases involving gifted or inherited property. There is no evidence that William's property deposited into the joint checking account was either gifted or inherited property.

Dianne's reliance on the Marital Property Act, ch. 766, STATS., is of no help to her.[2] Classification of prop-

---

[1] Dianne relies upon *Fowler v. Fowler,* 158 Wis. 2d 508, 463 N.W.2d 370 (Ct. App. 1990); *Brandt v. Brandt,* 145 Wis. 2d 394, 427 N.W.2d 126 (Ct. App. 1988); and *Trattles v. Trattles,* 126 Wis. 2d 219, 376 N.W.2d 379 (Ct. App. 1985).

[2] Dianne cites *Lloyd v. Lloyd,* 170 Wis. 2d 240, 487 N.W.2d 647 (Ct. App. 1992), to support her argument that the deposit of William's individual property into the joint account trans-

erty under WUMPA, whether owned as marital property or nonmarital property, does not determine how assets will be divided between the spouses if the marriage is dissolved. *See Kuhlman,* 146 Wis. 2d at 591, 432 N.W.2d at 296. WUMPA "is concerned only with the spouses' ownership of property during the marriage and at their death." *Id.*

Dianne also asserts that William's deposit of individual property into the joint checking account and subsequent payment of his individual obligations violated the provisions of the MPA that a spouse was to pay individual obligations with individual property. When read in isolation, the provision Dianne relies upon partially supports her argument, "Each party's individual obligations shall be the responsibility of that party's individual property." However, the entire agreement must be read and analyzed.

The agreement begins with the proposition "that any property held in the sole name of or received by either of the parties is conclusively presumed to be and shall be that party's individual property." Each party is given the exclusive right to manage and control his or her individual property. The MPA then considers different scenarios, including the contribution of effort and labor by one party to the other's property; investment or use of one party's property for the benefit of the other; or the investment or use of individual property for survivorship marital property. In each of these scenarios, Dianne and William agreed that there is a gift, unless there is written evidence of a loan. In none of the scenarios does the individual property become joint

---

formed the more than $2,000,000 into joint property. *Lloyd* is limited to the application of WUMPA's tracing of property after the death of a spouse.

property. None of these scenarios helps Dianne because William did not invest his individual property in Dianne's individual property; he did not use his property to benefit Dianne's property; and he did not use his individual property to benefit joint property or as an investment in joint property.

The MPA also does not provide for reclassification of property at the time the marriage is dissolved by death or divorce. The MPA's provisions covering death or divorce clearly provide that the character of the property—individual property or survivorship marital property—is determined as of the date of the event causing dissolution.

We are satisfied that the trial court's conclusion that William's use of the joint checking account was nothing more than a temporary storage facility for William's individual property was a proper exercise of discretion. The trial court appropriately considered the substance of the transaction rather than the form.

## C. SLINGER RESIDENCE

The agreement provided for a comprehensive division of all property in the event of divorce. Among the provisions was one dealing with the primary residence of the parties:

> if the marriage should terminate by divorce or annulment or if (the parties) should have a legal separation then each shall be entitled to property held in each's sole name and to the personal effects possessed by each, and each shall divide equally property owned in both names. *Mr. Gardner shall retain the primary residence of the parties regardless of who has title.* Neither party shall receive any alimony, support, maintenance payments or any

. portion of the property of the other except as follows. [Emphasis added.]

Construction on the parties' residence began just before their marriage in 1985. The residence was located in the Slinger area on land titled in William's name. Until 1987, the residence remained titled solely in William's name. After repeated requests from Dianne, William quitclaimed the property to the both of them in joint tenancy; Dianne believed that in order for married people to live as a family they had to own the house in their joint names. Before signing the quitclaim deed, William reminded Dianne that under the MPA he would get the residence in the event of a divorce.

During the divorce trial Dianne argued that she should receive one-half the value of the house because it was in their joint names. The trial court disagreed, finding that the terms of the MPA were unambiguous, and no matter the form of the title at the time of the divorce, William was to be given the house.

On appeal, Dianne argues that the MPA is ambiguous. She agrees that the language can be read as the trial court did but she also reads the language to provide that in the case of a divorce William would get the house and, if titled in joint tenancy, she would be entitled to a payment equal to one-half of the value of the house. She also argues for the first time on appeal that the doctrine of equitable estoppel precludes William from asserting that he gets the house even if it is in their joint names.[3]

---

[3] Dianne did not raise her equitable estoppel argument in the trial court. We will follow the general rule that issues raised for the first time on appeal will generally not be reviewed by this court. *See Wirth v. Ehly,* 93 Wis. 2d 433, 443-44, 287 N.W.2d 140, 145 (1980). In addition, Dianne does not adequately brief

This issue compels us to construe the marital property agreement, which requires us to determine whether the language of the agreement is ambiguous. Construction of a contract is a legal question that we decide independently of the trial court's determination. *See Old Tuckaway Assocs. Ltd. v. City of Greenfield*, 180 Wis. 2d 254, 280, 509 N.W.2d 323, 333 (Ct. App. 1993). The language of the MPA is ambiguous only when it is reasonably or fairly susceptible of more than one construction. *See id.* We will enforce the unambiguous language of the MPA as it is written. *See id.* Finally, it is not the duty of this court to use the rules of construction to revise an unambiguous agreement in order to relieve a party to the agreement from disadvantageous terms. *See id.* at 280-81, 509 N.W.2d at 333.

■

The language quoted above is plain and straightforward. It provides that in the event of divorce each party would keep his or her individual property and divide equally the jointly owned property. It then provides that no matter how the primary residence is titled, William would retain the primary residence of the party. If the MPA required William to pay Dianne one-half of the value of the primary residence, such obligation would be found in the exceptions to the provision that neither party shall receive any portion of the property of the other. We conclude that the lan-

---

the application of the doctrine of equitable estoppel to the facts of this case; she has failed to cite to us any case law which supports her argument. We will not independently develop Dianne's argument and, therefore, we will not consider this issue. *See Vesely v. Security First Nat'l Bank*, 128 Wis. 2d 246, 255 n. 5, 381 N.W.2d 593, 598 (Ct. App. 1985).

guage of the MPA is unambiguous and the trial court did not err in enforcing the unambiguous language by awarding the primary residence to William without any compensating payments to Dianne.

## II. JOINT BUSINESS VENTURE

William and Dianne jointly entered into a land contract on July 2, 1987, to purchase a parcel of land on west Brown Deer Road in the city of Milwaukee. They planned to develop a restaurant operation to be called Scenic Rail Dining that would offer a passenger train trip to and from Horicon along with full meal service. William and Dianne owned the company equally and Dianne was to be president. William provided all of the financial backing for this joint business venture, including $90,000 for the land and $390,000 for improvements to the lot and the construction of a depot building. He even provided the $25,000 Dianne needed to purchase her half of the stock.

Just before the operation started in 1988, Dianne stated that she expected to receive half of the rent to be paid for the use of the depot by Scenic Rail Dining to be paid to her directly because she was a co-owner of the real estate. William objected because of his substantial investment in the property. One of William's employes, Roger Schrieber, developed a plan to avoid friction between William and Dianne. Under Schrieber's plan, the real estate would be deeded to Scenic Rail Dining and the necessity of rental payments would be eliminated. Dianne, as a fifty percent shareholder in Scenic Rail Dining, would retain her interest in the real estate. After discussions with Schrieber, Dianne agreed to this plan.

According to the plan, Dianne deeded her interest to William who then quitclaimed the real estate to

Scenic Rail Dining in exchange for $480,000, the amount of his investment. The joint venture did not fare well; in late 1990, William and Dianne liquidated the company after it lost approximately $3,000,000 of William's money. As part of the liquidation, Scenic Rail Dining transferred the west Brown Deer property to one of William's companies, Gardner Realty, for $480,000 and used the proceeds to pay its debts. Subsequently, Gardner Realty sold the real estate for $240,000.

After William commenced this action in 1991, Dianne commenced a separate civil action based on her claim that the Scenic Rail transaction was the result of intentional misrepresentations by William and Schrieber. We affirmed the trial court's dismissal of Dianne's separate action in *Gardner v. Gardner,* 175 Wis. 2d 420, 499 N.W.2d 266 (Ct. App. 1993). We held that a spouse could not maintain a separate tort action alleging injury to marital property. *Id.* at 431, 499 N.W.2d at 270. Rather, we held that the allegations were appropriate for consideration by the family court when it divided the marital estate. *Id.; see also* §§ 767.255 and 767.275, STATS.

During the trial of the divorce action, Dianne's theory was that her transfer of the property was the result of a fraud perpetrated by William and Schrieber. She contends that their representations that the transfer would be in her best interest were fraudulent. The trial court found that no fraud was committed by either William or Schrieber. The court noted that it was sitting as a court of equity and, in considering the division of the marital estate, fairness was a paramount objective. In rejecting Dianne's claim to one-half of the value of the Scenic Rail property on the day she deeded her interest to William, the trial court stated, "No one in

their right mind could indicate that it would be fair for William to spend all of the money on Scenic Rail but for Dianne, at this date, to obtain half of the value of the property . . . ."

"The elements of fraud require a false representation of fact made with intent to defraud and reliance by the injured party on the misrepresentation. The reliance must be justifiable." *Loula v. Snap-On Tools Corp.,* 175 Wis. 2d 50, 54, 498 N.W.2d 866, 868 (Ct. App. 1993) (citation omitted). This issue presents a question of law because it requires us to decide if the facts dictate the legal conclusion reached by the trial court. We review questions of law de novo; however, we give special deference to the trial court's decision where the legal conclusion is intertwined with the facts. *See Ballenger v. Door County,* 131 Wis. 2d 422, 427, 388 N.W.2d 624, 628 (Ct. App. 1986).

We begin our discussion by noting that the trial court found Schrieber to be credible, "I was impressed by the sincerity of Mr. Schrieber. I understand that he is William's employee and friend but I cannot possibly find that he did anything to defraud Dianne at anytime." Upon a conflict in the testimony, the trial court is the arbiter of the credibility of witnesses and of the weight of the testimony; and if more than one reasonable inference can be drawn from the evidence, the appellate court must accept the inference drawn by the trial court. *Cogswell v. Robertshaw Controls Co.,* 87 Wis. 2d 243, 250, 274 N.W.2d 647, 650 (1979). The trial court has a superior opportunity to observe the demeanor of the witnesses and to gauge the persuasiveness of their testimony. *Johnson v. Merta,* 95 Wis. 2d 141, 152, 289 N.W.2d 813, 818 (1980).

Dianne failed to present any evidence to support her argument that William and Schrieber made a false representation of fact made with intent to defraud her. There is no evidence that any representation related to a present or preexisting fact. The general rule is that no party has the right to rely upon a statement of opinion. *Lundin v. Shimanski,* 124 Wis. 2d 175, 192, 368 N.W.2d 676, 684 (1985). The statement to Dianne that transferring title to Scenic Railroad would be in her best interest is a statement of opinion.

An exception to the general rule holds that a statement of opinion is actionable if the speaker knows of facts incompatible with his or her opinion. *Id.* However, there is no evidence that William or Schrieber knew of any facts incompatible with the opinion that the 1988 transfer of her interest in the Scenic Rail property would be in Dianne's best interest.

There also is no evidence that Dianne relied upon the statements of opinion. In fact, Dianne testified that she never believed that her transferring title to William was in her best interest.

Dianne suffered no financial hardship in the Scenic Rail venture. She did not initially invest any of her own minimal assets, and when the venture was liquidated she was able to walk away without any financial loss. William gave Dianne the $25,000 she needed to pay for her share of the stock. When the land was purchased, William provided the $90,000 purchase price and the $390,000 needed to make the necessary improvements. William made up the $3,000,000 in losses from his substantial income and assets. When William transferred the land to Scenic Rail, the price was $480,000, his investment. When Scenic Rail was

liquidated, the land was sold to Gardner Realty for $480,000 and the proceeds were used to pay Scenic Rail's debts. And, when Gardner Realty finally sold the land the sale price was $240,000.

We are persuaded that the trial court did not err when it found that Dianne's transfer of title to William was not triggered by any intentional misrepresentation.

## III. FRIVOLOUS ACTION

William moved for an award of reasonable attorney's fees under §§ 802.05 and 814.025, STATS. In a separate opinion the trial court found that Dianne's counsel's signing of a motion for a de novo hearing on the family court commissioner's denial of maintenance was not well grounded, nor warranted by existing law or a good faith argument for the extension of existing law. The trial court also held that Dianne's arguments that she was defrauded on the transfer of the Scenic Rail property and was entitled to one-half of William's personal property deposited in the joint checking account during the course of the marriage were frivolous under § 814.025, STATS. The trial court awarded nominal attorney's fees. It found William's affidavits establishing his attorney's fees in excess of $281,000 to be insufficient in setting fees because they failed to itemize the fees. The court reviewed the hearings conducted during the course of the proceedings and determined that seven hours had been devoted to frivolous issues. Using William's lead counsel's rate of $275 per hour, the court set the sanctions against Dianne at $1925.

## A. VIOLATION OF § 802.05(1), STATS.

Dianne sought temporary maintenance after the trial court had declared the MPA to be valid and enforceable and this court had denied a petition for leave to appeal. Her counsel prepared, signed and filed a motion seeking a de novo review of the family court commissioner's decision denying her request. In holding that in signing the motion counsel had violated § 802.05, STATS., the trial court reasoned that because the MPA was valid and enforceable and denied maintenance to Dianne, any motion for temporary maintenance did not have a basis in fact or existing law and there was no good faith argument for a change in the law.

Section 802.05(1)(a), STATS., provides:

> Every pleading, motion or other paper of a party represented by an attorney shall contain the name . . . of the attorney . . . . The signature of an attorney . . . constitutes a certificate that the attorney . . . has read the . . . motion . . . that to the best of the attorney's . . . knowledge, information and belief, formed after reasonable inquiry, the . . . motion . . . is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and that the . . . motion . . . is not used for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Dianne argues she did not violate § 802.05(1), STATS., because the MPA did not bar temporary maintenance.[4] She contends that when she submitted her

---

[4] Section II.F. of the Marital Property Agreement embodies the parties' arrangement in the event of a divorce. In part, the MPA provided, "[i]f the marriage should terminate by divorce

motion for temporary maintenance she was in dire financial straits because the divorce had been commenced over a year earlier; the date she would receive any further payments under the MPA was unknown; and there was no bar to a family court commissioner or a trial court granting her temporary maintenance. Dianne's argument rings hollow. Under the MPA she received a $10,000 payment from William on the day he commenced the divorce proceedings and the MPA provided that the scheduled payments totaling $200,000 were in lieu of maintenance.

Our standard of review of a determination that counsel has violated § 802.05(1)(a), STATS., is deferential. *See Riley v. Isaacson,* 156 Wis. 2d 249, 256, 456 N.W.2d 619, 622 (Ct. App. 1990). We accept findings of fact that are not clearly erroneous. Determining how much legal research is necessary to constitute "reasonable inquiry" under § 802.05(1)(a) is left to the trial court's discretion. *See Riley,* 156 Wis. 2d at 256, 456 N.W.2d at 622.

We are satisfied that the trial court faithfully exercised its discretion when it concluded that "[n]othing could be served by going to the family court commissioner for additional maintenance which was

. . . (n)either party shall receive any alimony, support, maintenance payments or any portion of the property of the other except as follows: . . .." The MPA goes on to provide that if the marriage should survive more than five years, William would pay to Dianne the amount of $200,000 in installments. An installment of $10,000 was payable when the divorce was commenced, $40,000 on the day the judgment of divorce was granted and $50,000 installments would be due six, twelve and eighteen months after the judgment of divorce.

specifically denied by the Agreement nor could any useful purpose be served by appealing [the Family Court Commissioner's] obviously correct decision." Minimal legal research is required when the MPA, in clear and precise terms, denies either party alimony, support or maintenance payments. The trial court's finding that Dianne's counsel violated § 802.05, STATS., is supported by the evidence, and it properly assessed actual costs against counsel.

### B. FRIVOLOUS COSTS UNDER § 814.025, STATS.

Dianne debates the application of § 814.025, STATS., in divorce actions.[5] She reads the statute very

[5] **814.025. Costs upon frivolous claims and counterclaims.**
**(1)** If an action or special proceeding commenced or continued by a plaintiff or a counterclaim, defense or cross complaint commenced, used or continued by a defendant is found, at any time during the proceedings or upon judgment, to be frivolous by the court, the court shall award to the successful party costs determined under s. 814.04 and reasonable attorney fees.

**(2)** The costs and fees awarded under sub. (1) may be assessed fully against either the party bringing the action, special proceeding, cross complaint, defense or counterclaim or the attorney representing the party or may be assessed so that the party and the attorney each pay a portion of the costs and fees.

**(3)** In order to find an action, special proceeding, counterclaim, defense or cross complaint to be frivolous under sub. (1), the court must find one or more of the following:

(a) The action, special proceeding, counterclaim, defense or cross complaint was commenced, used or continued in bad faith, solely for purposes of harassing or maliciously injuring another.

(b) The party or the party's attorney knew, or should have known, that the action, special proceeding, counterclaim, defense or cross complaint was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

**(4)** To the extent s. 802.05 is applicable and differs from this section, s. 802.05 applies.

248

literally and concludes that arguments made in the course of a divorce action can never be found frivolous because they do not constitute an action or special proceeding or a defense, counterclaim or cross-complaint. Dianne would limit the application of the statute to the frivolousness of pleadings recognized in ch. 802, STATS., and not to include any argument counsel made during the course of a proceeding. Dianne also insists that even if the statute would apply to the arguments she made on the division of the Scenic Rail property and the joint checking account, the trial court erred because it failed to address the specifics of her argument.

Dianne's argument for a narrow interpretation of § 814.025, STATS., presents a question of law to which we owe no deference to the trial court. *Stoll v. Adriansen,* 122 Wis. 2d 503, 510, 362 N.W.2d 182, 186 (Ct. App. 1984). Our goal in construing the statute is to reach a reasonable construction that will effectuate the purpose of the statute. *Id.*

Dianne's assertion that the statute is to be applied literally to actions, special proceedings, defenses, counterclaims or cross-complaints unreasonably limits the scope of the statute. Her reasoning would permit attorneys to adopt a posture in litigation and to make any argument they wish during court proceedings and, as long as the argument is not a pleading, be insulated from the imposition of sanctions no matter how preposterous the argument. Dianne ignores the fundamental principle that courts must enforce the statute for "the purpose of maintaining the integrity of the judicial system and the legal profession." *Id.* at 511, 362 N.W.2d at 187.

■■■

Dianne fails to cite any Wisconsin authority that supports her position. We are convinced that what constitutes frivolous actions cannot be limited as Dianne argues; rather, they must be defined within the context of the litigation. *See Swartwout v. Bilsie,* 100 Wis. 2d 342, 349 n.4, 302 N.W.2d 508, 513 (Ct. App. 1981). Dianne's argument does not recognize "the continuing duty of every litigant and lawyer to determine whether the judicial system will be abused by a demand for or resistance to judicial relief." *Id.* at 350, 302 N.W.2d at 514. In this case, Dianne's posture adopted during these proceedings sought affirmative judicial relief in the form of one-half of all personal property deposited by William in the joint checking account and rescission of her transfer of interest in the Scenic Rail property. Her arguments depleted judicial resources the same as if she had filed and maintained a defense or an action. We reject her narrow interpretation; to do otherwise would be to accelerate the wanton waste of limited judicial resources.

■■■

Dianne next argues that her positions advocated during the proceedings are not frivolous. This is a question of whether a reasonable attorney would or should have concluded that the claims were without reasonable basis in law or equity. *See Stoll,* 122 Wis. 2d at 513, 362 N.W.2d at 187. This is a mixed question of law and fact. *See id.* The trial court's determination of what a reasonable attorney or litigant would or should have known is a finding of fact that we will affirm unless it is clearly erroneous. *See id.* at 513, 362 N.W.2d at 187-88. However, the legal significance of those findings is a question of law that we answer without deference to the trial court. *See id.* at 513, 362 N.W.2d at 188.

250

The trial court found that Dianne's claim for one-half of William's personal property deposited in the joint checking account had no basis in existing law, nor did it have a reasonable chance of changing existing law. The court also found that there was no factual basis from which to rescind Dianne's transfer of her interest in the Scenic Rail property. From our own independent review of the record, we conclude that these findings are not clearly erroneous.

The factual determinations of the trial court lead us to independently conclude that a reasonable attorney or litigant, armed with knowledge of the facts and circumstances surrounding the use of the checking account and the transfer of the property, knew or should have known that adopting and pursuing these two claims would be without any reasonable basis in law or in fact. Nor can the claims be supported by a good faith argument for an extension, modification or reversal of existing law.

*By the Court.*—Judgment and order affirmed.