GENERAL STAR INDEMNITY COMPANY, a foreign corporation, Plaintiff-Respondent-Cross Appellant, †

v.

The BANKRUPTCY ESTATE OF LAKE GENEVA SUGAR SHACK, INC., by its Trustee John F. Waldschmidt, a Wisconsin corporation, and The Bankruptcy Estate of Dana Montana, by its Trustee Michael F. Dubis, Defendants-Third-Party Plaintiffs-Appellants-Cross-Respondents,

v.

HORIZON INSURANCE AGENCY, INC., Third-Party Defendant-Respondent-Cross Appellant.†

Court of Appeals

*No. 96–2156. Submitted on briefs September 24, 1997.—Decided November 12, 1997.*

(Also reported in 572 N.W.2d 881.)

†Petition to review denied.

On behalf of the defendants-third-party plaintiffs-appellants-cross-respondents, the cause was submitted on the briefs of *Christopher T. Hale* of *Hale & Lein, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent-cross appellant and the third-party defendant-respondent-cross appellant, the cause was submitted on the briefs of *James A. Baxter, Esq.* and *Rebecca Leair, Esq.* of *Mitchell, Baxter, O'Meara & Mathie, S.C.* of Milwaukee.

Before Brown, Nettesheim and Anderson, JJ.

ANDERSON, J. The bankruptcy trustee of the Lake Geneva Sugar Shack, Inc. and its owner Dana Montana appeal and General Star Indemnity Company (GenStar) cross-appeals from a judgment entered after a jury trial and motions after verdict. Montana was exonerated of the allegations relating to arson and

misrepresentation, except for the claim that she intentionally misrepresented her business interruption claim of $40,000. The trial court held that Montana's misrepresentation of business losses voided all coverage under an insurance policy Montana had purchased from GenStar insuring the Sugar Shack. Because we hold that the evidence does not rise to the level of fraud or misrepresentation contemplated by the law, we reverse this portion of the judgment.

Montana also seeks reversal of the trial court's striking the $3,327,000 consequential damages award. Assuming without deciding that Montana can receive consequential damages for GenStar's breach of the insurance contract, we conclude that Montana's cross-collateralization of her three properties was not reasonably foreseeable by GenStar. Accordingly, we affirm this portion of the judgment.[1]

GenStar has raised numerous claims in its cross-appeal. In sum, we affirm that portion of the judgment in which the trial court changed the jury's answer that Montana had concealed or misrepresented a material fact regarding the fire at the Sugar Shack because it

---

[1] Because we reverse the judgment on the jury's finding of misrepresentation, we will not address Montana's remaining arguments on the avoidance clause and the erroneous jury instructions. In addition, our conclusion that Montana is not entitled to consequential damages also disposes of GenStar's arguments on cross-appeal regarding consequential damages; GenStar's argument on setoffs was undeveloped. *See Sweet v. Berge*, 113 Wis. 2d 61, 67, 334 N.W.2d 559, 562 (Ct. App. 1983) (if a decision on one point disposes of an appeal, we will not decide other issues raised); *Fritz v. McGrath,* 146 Wis. 2d 681, 686, 431 N.W.2d 751, 753 (Ct. App. 1988) (appellate court does not consider arguments broadly stated but not specifically argued).

was inconsistent with its earlier answer that Montana did not directly cause or solicit the fire. Although we do not view the two questions as inconsistent, we conclude that Montana's concerns about the well pump are not material. We further conclude that the evidence supports the jury's findings of mistake and of an agency relationship. Because we find no additional errors in the trial court's holdings, we affirm the judgment on the remaining issues.

## Facts

In July 1989, Montana purchased a commercial lines insurance policy from GenStar covering the Sugar Shack, a tavern and male dance club owned by Montana, for approximately $10,000. On February 16, 1990, a fire damaged the Sugar Shack. Montana filed claims for the building, the contents and business interruption with the assistance of Sarasohn & Company, a public insurance adjusting company.

GenStar denied coverage and filed a declaratory judgment action alleging that the policy was void for any or all of the following reasons: (1) Montana misrepresented the presence of sprinklers, alarmed fire extinguishers and emergency lighting on the premises in applying for coverage; (2) Montana violated the protective safeguards endorsement; (3) Montana committed arson; and (4) Montana misrepresented the amount of damages resulting from the fire in the submission of her claim to GenStar. Montana counterclaimed for breach of contract, defamation and interference with contract. She filed a third-party complaint against Horizon Insurance Company, Martin D. Wolfinsohn d/b/a JAS Insurance Services (JAS Insur-

ance) and Richard Oleneck, as agents of GenStar,[2] for breach of contract in obtaining insurance and for negligence in procuring insurance for the Sugar Shack; and she filed a third-party complaint against Mike McNichols, individually, and as a claim manager for Frontier Adjusters of Milwaukee for defamation and for interference with a contract. GenStar filed cross-claims for indemnity and/or contribution against JAS Insurance, Oleneck, Frontier and McNichols.

GenStar moved for summary judgment. The trial court only granted partial summary judgment to GenStar on Montana's defamation claim; all other motions were denied.[3] The case finally went to trial in March 1996. The remaining parties were GenStar, Horizon, Montana and the Sugar Shack. The jury found that Montana did not commit arson and that she did not tell Oleneck that the Sugar Shack had a sprinkler system. The jury also determined that Oleneck and JAS Insurance were agents of GenStar; that their representation

---

[2] Oleneck failed to answer the third-party complaint. JAS Insurance filed a motion for default judgment against Oleneck which the court granted in August 1992. In addition, JAS Insurance's insurer, General Insurance of America, was added as a party in November 1992.

[3] Frontier and McNichols moved for summary judgment and JAS Insurance moved for partial summary judgment as well. In March 1993, Montana settled with and agreed to dismiss JAS Insurance, and its insurer, General Insurance, from the case. JAS Insurance's default judgment against Oleneck was not dismissed. In addition, Frontier's and McNichols' summary judgment motions were denied in March 1993. In April 1993, Harbor Insurance Company, the liability carrier for Frontier was added as a party. In July 1993, Montana settled with Frontier, Harbor Insurance and McNichols. In exchange for $50,000, the defamation and tortious interference with contract claims were dismissed.

to GenStar that the Sugar Shack was sprinklered and alarmed was not made with intent to deceive, but that GenStar relied on their representation and it was material to the risk of the policy GenStar insured; and that the lack of operating sprinkler and alarm systems contributed to the fire loss.

The jury further determined that the protective safeguards endorsement was included in the policy as a result of a mistake by Oleneck, JAS Insurance and Horizon Insurance. The jury also found that Montana misrepresented information she submitted to GenStar that related to the business interruption claim and the cause of the fire. The jury concluded that GenStar breached its contract and awarded Montana approximately $260,000 in compensatory damages and $3,327,000 in consequential damages.

The parties filed motions after verdict. GenStar also filed a motion for a new trial based on newly discovered evidence. The trial court changed the jury's answer that Montana misrepresented the cause of the fire from "yes" to "no." The court further determined that because of Montana's misrepresentation of a material fact with respect to her business interruption losses, the policy was void and there was no coverage under the policy. The court further struck the jury's consequential damages award because those damages were not foreseeable as a matter of law at the time the policy was issued. All other motions by GenStar and Montana were denied. Judgment was entered. Montana appeals and GenStar cross-appeals. Additional facts will be included within the body of the decision as necessary.

*Fraud as to Business Interruption Claim*

Montana first argues that the jury's finding of intentional misrepresentation of her business interruption claim is not supported by credible evidence. At trial, Montana testified that she could bring in as much money in two days as three or four because most customers made reservations rather than walking in the door and the expenses were condensed. When the Illinois Sugar Shack opened, she limited the reservations at the Lake Geneva operation to Friday and Saturday. Montana also explained that she had slated a "media blitz" and the promotion of a book she had written for the spring of 1989. Because of the delays caused by the 1989 fire at the Sugar Shack, Montana explained that she planned to wait until the spring of 1990 for the media blitz. She anticipated that when her book came out and she appeared on talk shows, it would be instant publicity and the Sugar Shack could be open more and she could "book reservations for five days a week which is what we fully intended to go back to, but not until the publicity hit."

According to the testimony of Montana's adjuster, Steven Schwed, he relied on some historical information and on Montana's representation that the club was going to be open more days than it was in the past for his projections. Schwed testified that he made two accounting assumptions: (1) the average daily sales would increase by twelve per cent and (2) the number of days in operation would increase. He based his average daily sales on the figures when the Sugar Shack was open two days a week, rather than taking into account the decreased average sales when it was open four or five days a week ($1921 compared to $1374). He also

stated that Montana was not involved in the calculations and that he never went through his projections or explained how he had calculated the loss to Montana. Schwed denied intentionally exaggerating any of the business income loss numbers.

GenStar's adjuster, John Peters, disagreed with Schwed's assumptions. Peters testified that he projected a thirty-eight per cent decline in sales at the Sugar Shack and he disagreed with Schwed's concept of taking a straight percentage of profit and use of a blanket percentage of sales. Peters testified to the differences in his calculation and those by Schwed. He believed Schwed's sales projections were overstated and inconsistent with the prior history of the business. Peters credited the overprojection of sales on the assumption that the Sugar Shack would be open six days in the summer of 1990 and on "creative accounting" on the part of Schwed; "he distorted the daily calculation of sales."

Peters also testified that the proof of loss filed after the 1989 fire was also predicated on an increase in the number of days the Sugar Shack would be open. He calculated that Montana had used approximately $70,000 of the 1989 fire insurance proceeds to pay off a federal tax debt. Peters believed that Montana was better off financially with a fire.

According to Montana, the jury "found fraud not based upon credible evidence, but upon the mere fact that her opinion was different." Montana claims that a mere overvaluation, in the absence of evidence that the purported misstatements were made knowingly and with the intent to deceive, is not evidence of misrepresentation. She argues that a fact finder cannot presume fraud merely because of a discrepancy between estimates of the value of the lost property.

■

Though we must sustain jury findings if they are supported by any credible evidence, *see Kimps v. Hill*, 187 Wis. 2d 508, 513, 523 N.W.2d 281, 284 (Ct. App. 1994), *aff'd*, 200 Wis. 2d 1, 546 N.W.2d 151 (1996), a determination of whether GenStar's evidence establishes fraud is a question of law, *see Gardner v. Gardner*, 190 Wis. 2d 216, 243, 527 N.W.2d 701, 710 (Ct. App. 1994). The party making the charge of fraud must prove it by clear and satisfactory evidence, a higher standard of proof than in the ordinary civil action. *See State v. Walberg*, 109 Wis. 2d 96, 102, 325 N.W.2d 687, 691 (1982). We review questions of law de novo. *See Gardner*, 190 Wis. 2d at 243, 527 N.W.2d at 710.

■

GenStar counters that in Wisconsin, an overvaluation in proof of loss is competent evidence to prove fraud. In support of this, GenStar points to Peters' testimony that Montana's claim was based on the unwarranted assumption that she would be open more than two days a week and on "creative accounting." We conclude that GenStar failed to produce sufficient affirmative proof that Montana committed fraud.

First, Montana's intention of being open for more than two days after her anticipated "media blitz" does not constitute a present or preexisting fact. The general rule is that no party has the right to rely upon a statement of opinion. *See Gardner*, 190 Wis. 2d at 244, 527 N.W.2d at 710. " 'Ordinarily a prediction as to events to occur in the future is to be regarded as a statement of opinion only, on which the adverse party has no right to rely.' " *Lundin v. Shimanski*, 124 Wis. 2d 175, 192, 368 N.W.2d 676, 684 (1985) (quoted source omitted; internal quotation omitted).

An exception to the general rule holds that a statement of opinion is actionable if the speaker knows of facts incompatible with his or her opinion. *See Gardner*, 190 Wis. 2d at 244, 527 N.W.2d at 711. There is no evidence that Montana knew of any facts incompatible with her opinion that the media blitz would bring instant publicity and would allow her to book reservations for more than two days a week. GenStar's only evidence challenging this fact is that Montana stated the Sugar Shack would be open more than two days after the 1989 fire, but she failed to follow through with this plan. Montana explained why the Sugar Shack continued to operate only two days per week through 1989. This may speak to a past misrepresentation regarding a previous insurance claim; however, it does not convert Montana's stated intentions into statements of present fact or preexisting fact as to GenStar's policy.

GenStar's claim of fraud also focuses on what it perceives to be Montana's overvaluation of the property. Even though an overvaluation may be so grossly exaggerated as to raise the presumption of fraud, it is generally agreed that a mere overvaluation in proof of loss is not conclusive that fraud has been committed. *See Wiesman v. American Ins. Co.*, 184 Wis. 523, 530, 199 N.W. 55, 58 (1924). Rather, it must be shown that the misstatements were made knowingly and with the intent to deceive the insurer concerning some matter material to the insurance. *See id.* Where a party acts in good faith and with the honest belief that the property was worth the amount claimed, an excess found by the jury will not avoid recovery where intent to defraud is not shown. *See Stebane Nash Co. v. Campbellsport Mut. Ins. Co.*, 27 Wis. 2d 112, 124, 133 N.W.2d 737, 745 (1965). "Overvaluation on one hand and wilful misrep-

resentation and fraud on the other do not follow *ipso facto.*" *Id.* at 125, 133 N.W.2d at 745.

Specifically, GenStar takes issue with Montana's "creative accounting" methods. What GenStar simply ignores is the fact that Montana utilized an independent auditor to assess her loss and that the auditor's projections were based on his own accounting assumptions. Montana was not consulted; Schwed stated that he never went through his projections or explained how he had calculated the loss to Montana. There is no evidence that Montana knowingly submitted the proof of loss with the intent to deceive GenStar. Rather, she sought expert advice from an individual who utilized accounting methods which were found to be unacceptable to GenStar's auditor. Although the use of an independent auditor does not, by itself, immunize one from a finding of fraud, the person claiming fraud must prove that the accused party and the auditor acted in harmony to achieve a common end. Such proof is lacking here. It is evident that GenStar's auditor strongly disagreed with the assumptions and projections made by Montana's auditor. This however does not rise to the level of fraud or misrepresentation contemplated by the law.

Finally, we note that the competing assessments of the loss by the respective parties are not that grossly disparate. Montana's adjuster projected the actual value of the business income loss to be $60,117.89 for four months. The claim under the policy, however, was $40,000, the policy limit.[4] GenStar's adjuster calcu-

---

[4] In its respondent's brief, GenStar contends that Montana submitted a proof of loss for business interruption for nine months, totaling $179,636.63. This is incorrect. The $179,636.63 figure was the amount that Montana's adjuster projected for the actual monthly loss of business income. How-

lated the business interruption loss at $8174 for six months, or $5449.32 over four months. The jury awarded $27,300 for four months, or $6825 per month. Based on the Sugar Shack being open for two days per week, the daily average sales would be projected as $1250 per day by Montana, $166 per day by GenStar and $853.13 per day by the jury. Overvaluation raises a presumption of fraud in proportion to the excess. *See Stebane*, 27 Wis. 2d at 124, 133 N.W.2d at 745. The comparative values of the disputed daily average sales raise only the weakest of inferences that Montana intended to misrepresent her figures. We conclude that such an inference, especially in light of the competing equally reasonable inferences, is insufficient to satisfy GenStar's higher than ordinary burden of proof. We reverse this portion of the judgment.

### Consequential Damages Award

Next, Montana contends that the trial court erred in striking the $3,327,000 in consequential damages the jury awarded because of the foreclosure of her properties that followed GenStar's refusal to pay her losses. At the time of the fire, Montana owned the Sugar Shack of Stone Park, Illinois and three Wisconsin properties, the Lake Geneva Sugar Shack, Sugar Legacy Arabians and the Broad Street Property. The three Wisconsin properties were purchased on a land contract and were refinanced by Archie Gaudreau with the properties as collateral. The GenStar policy insuring the Lake Geneva Sugar Shack also named Gaudreau as the mortgage holder. The land contract contained a balloon payment in the amount of $700,000

---

ever, the claim submitted with the proof of loss was for only $40,000, the policy limit.

that became due on February 14, 1990. Montana attempted to obtain refinancing to pay off the balloon payment; however, that fell through. Eventually, Gaudreau foreclosed on Montana's three cross-collateralized properties.

At trial, Montana sought consequential damages in an amount equal to the assessed values of the three properties. Montana argued that GenStar's breach of its contract was a substantial factor in the loss of her properties and that she was entitled to recover damages, equal to the value of her properties, which were the natural and probable result of GenStar's breach. The jury agreed and awarded $3,327,000 in consequential damages.

On motions after verdict, the trial court struck the jury's consequential damages award. The court noted that had the loss of investment properties been contemplated by the parties, the premium would have reflected such coverage. The premium indicated such coverage was not foreseeable. The court concluded that the "loss of investment properties due to a loss of cash flow . . . [is] not foreseeable damages for the breach of a contract."

On appeal, Montana argues that Wisconsin, like most jurisdictions, allows the award of consequential damages in breach of contract actions and that the jury determined that her losses were foreseeable and should not be disturbed. We disagree.

We will assume, without deciding, that Montana can receive consequential damages for GenStar's breach of the insurance contract.[5] Nevertheless, the

---

[5] We recognize that case law contains some anomalous references to consequential damages for breach of an insurance contract. The supreme court in *Newhouse v. Citizens Security Mutual Insurance Co.*, 176 Wis. 2d 824, 839, 501 N.W.2d 1, 7

amount of damages Montana is entitled to is limited to such damages as are the natural and probable consequences of the breach and were within contemplation of the parties when the contract was made. *See Thurner Heat Treating Co. v. Memco, Inc.*, 252 Wis. 16, 25, 30 N.W.2d 228, 232 (1947). The damages must "flow directly and necessarily from the breach of contract, and must be reasonably foreseeable at the time the contract was made as a probable result of the breach." *Reiman Assocs., Inc. v. R/A Adver., Inc.*, 102 Wis. 2d 305, 321, 306 N.W.2d 292, 300 (Ct. App. 1981).

We conclude as a matter of law that the cross-collateralization of Montana's investment properties and coverage thereof in the case of a breach were not contemplated by the parties when the contract was made. GenStar's fire insurance policy insured against the loss of the Sugar Shack and its contents. There is no evidence that GenStar had any knowledge at the time of contracting of the relationship of the additional properties. In fact, Montana's $10,000 premium, allegedly in exchange for $3,327,000 in cross-collateralized property, strongly suggests that the risk of such liabil-

(1993), concluded that an excess judgment can result from an insurer's breach of its duty to defend in the absence of bad faith. *Newhouse*, however, fails to provide guidance as to whether consequential damages are available in a breach of contract case not involving a third party. Also, in *Heyden v. Safeco Title Insurance Co.*, 175 Wis. 2d 508, 518, 498 N.W.2d 905, 908 (Ct. App. 1993), *overruled on other grounds by Weiss v. United Fire & Casualty Co.*, 197 Wis. 2d 365, 382, 541 N.W.2d 753, 758–59 (1995), this court expressed no view as to what portion of the claimed damages, if any, would have been recoverable in the breach-of-contract action as consequential damages. These cases provide little guidance.

ity was never contemplated by the parties.[6] We hold that under no circumstances could GenStar's policy be transformed into an insurance policy which was intended to cover the additional, unrelated and collateral investment dealings of Montana. We affirm this portion of the judgment.

## GENSTAR'S CROSS-APPEAL

### *Change of Jury's Answer*

GenStar first argues that the trial court erred in changing the jury's answer finding that Montana had misrepresented or concealed a material fact concerning the cause of the fire from "yes" to "no." The trial court changed the jury's answer at motions after verdict. The court determined that the jury's answer that Montana was not an arsonist but that she concealed a material fact as to the cause of the fire was inconsistent and the "answer to number one prevails over 12 as to cause of fire being incendiary, and Montana being involved." The court also found that there was insufficient evidence to sustain the answer. The court noted that "there was complete disagreement by the parties involved as to the cause of the fire and how it happened and who did it. So I don't think there's any evidence to show that that was a fraudulent answer, absent a finding that she was involved."

The trial court entered an order to change the verdict "on the ground of insufficiency of the evidence." *See*

---

[6] RESTATEMENT (SECOND) OF CONTRACTS § 351 cmt. f (1981), states that an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question suggests that it was not intended to cover the risk of such liability. Montana's $10,000 premium for over $3,000,000 in liability implies no coverage by GenStar.

§ 805.14(5)(c), STATS. "[W]hen the court changes an answer in the jury's special verdict, or otherwise overturns a jury finding, we defer to the verdict by applying the traditional any-credible-evidence standard . . . ." *Foseid v. State Bank of Cross Plains*, 197 Wis. 2d 772, 787, 541 N.W.2d 203, 209 (Ct. App. 1995). "[I]f there is any credible evidence which, under any reasonable view, fairly admits of an inference that supports a jury's finding, that finding may not be overturned." *Id.* at 782, 541 N.W.2d at 207. Nevertheless, " '[a] jury cannot base its findings on conjecture and speculation.' " *Id.* at 791, 541 N.W.2d at 210 (quoted source omitted). We agree with the court's changing the answer.[7]

Montana testified that as she was driving to the fire, she was concerned that a short in the well pump, which she did not have replaced, might have caused the fire. She stated that when she arrived at the Sugar Shack she was told it was arson; she did not think it was important to tell David Halvorson, the fire investigator, about the well pump because he had already concluded that she had committed arson. Montana's fire expert, Patrick Kennedy, also testified that Gen-Star's fire investigator, Gerald Haffner, came to a premature conclusion of arson and owner involvement in the fire. The proof of loss indicated that the cause and origin of the loss were unknown to the insured.

---

[7] We do not see the inconsistency in the two questions. The first question pertained to Montana's possible role as an arsonist or one who solicited arson. Question twelve focused on whether Montana misrepresented an important fact regarding the cause of the fire on her proof of loss. Montana could have intentionally misrepresented a material fact about a potential cause of the fire without being an arsonist.

The day of the fire, McNichols, who works for Frontier Adjusters, an independent insurance agency that investigates, evaluates and attempts to settle insurance claims for insurance companies, was hired by GenStar to investigate the Sugar Shack claim. McNichols was contacted by Halvorson, who informed him, "off the record," that "it appeared that [the Sugar Shack fire] may have been an arson cover up." Halvorson gave McNichols names of possible people to contact and specific questions to ask. McNichols then hired a cause and origin expert, Haffner, to conduct an examination of the property the next day. Haffner's opinion was that the fire was of incendiary origin, that there appeared to be a keyed entry and that the fire started in the men's bathroom. McNichols conveyed this information to GenStar. GenStar's investigation focused on Montana.

█

We conclude that GenStar failed to set forth facts establishing that Montana's concerns about the well pump were material to its investigation at all. William Costello, GenStar's claim manager, stated that by Saturday, the day after the fire, GenStar had confirmed that it was an incendiary fire. Thereafter the investigation centered on Montana. There is no evidence that GenStar asked Montana her opinion about a possible cause of the fire—GenStar believed arson was the cause. Even if Montana had told GenStar, she most likely would have been disregarded; GenStar was not interested in exonerating Montana. GenStar has not put forth any evidence that even suggests the focus of

its investigation was on anything other than arson committed by Montana.[8]

We also question whether Montana's suspicion that a short in the well pump's circuitry might have played a role in the fire is a misrepresentation of a *material fact*. Even if GenStar learned that the well pump circuitry had started the fire, it still would have been obligated to provide coverage under its policy. Montana's failure to disclose her suspicions would not invalidate the policy; therefore, it could not be mate-

---

[8] It is evident from William Costello's, GenStar's claim manager, testimony that Montana was in a no-win situation. He had the following colloquy on cross-examination:

Q: Part of your conclusion that Miss Montana swore falsely . . . was when she was asked if she was involved in this arson, she said no right?

A: That's correct.

Q: [S]he was asked if she was the arsonist and she answers yes, are you going to provide coverage?

A: No.

Q: And if she answers no, are you going to provide coverage?

A: Given the facts of this, no.

Q: So that there was no answer there that she could have given without General Star declining coverage, correct?

A: Not necessarily. . . . [S]he could refuse to submit a proof of loss under oath. . . . She [could] refuse [the examination under oath] also.

Q: Then one of the reasons for declining coverage would be the failure to cooperate with [GenStar] and take an examination under oath, wouldn't it have been?

A: Yes.

Q: And if she had failed to submit a sworn proof of loss, another reason would have been the failure to submit a sworn proof of loss, correct?

A: That's correct.

rial. Accordingly, we affirm the trial court's changing answer twelve from "yes" to "no."

*Jury Instructions Relating to McNichols*

GenStar next argues that the trial court erred in: (1) refusing to instruct the jury that anything McNichols said or did could not be considered in determining whether GenStar breached the policy; and (2) failing to apportion damages because there was a combination of a breach of contract and McNichols' tort that together caused Montana's losses.

Montana charged GenStar, Frontier and McNichols with defamation and interference with contract. Prior to trial, Montana reached a settlement and release with McNichols and Frontier. The release specifically provided in part:

> In consideration for the payment of the sum of [$50,000] . . . [Montana and the Sugar Shack] hereby fully and forever release, acquit, and discharge [McNichols, Frontier and Harbor Insurance] . . . from any and all liability now accrued or hereafter to accrue on account of any and all claims or causes of action which the Releasors now or may hereafter have against the Releasees for any and all injuries, losses, and damages . . . whether sounding in either contract or tort or any other form of damages . . . .
>
> This is a release of the persons and entities specifically designated herein. . . . Releasors fully reserve any and all rights or cause of action against every other person and entity . . . . This Release and settlement is not intended to extinguish any claims which exist in favor of the Releasors against [Gen-Star], excepting only those claims of defamation or tortious interference with contract arising as the result of vicarious or imputed liability that may be

125

ascribed to [GenStar] as a result of any conduct of the Releasees.[9]

At trial, GenStar sought instructions directing the jury that GenStar may not be found responsible for anything which McNichols or Frontier said or did in the adjustment of the claim for insurance and in apportioning damages between McNichols and GenStar. The trial court determined that both instructions, as drafted, were too broad. Only if GenStar narrowed the instructions to defamation of character and tortious interference of contract by McNichols was the court willing to include either instruction. GenStar chose not to include a narrower version of the instructions. GenStar now seeks review of this decision.

A circuit court has broad discretion when instructing a jury as long as the instruction fully and fairly informs the jury of the rules and principles of law applicable to the particular case. *See Nowatske v. Osterloh*, 198 Wis. 2d 419, 428, 543 N.W.2d 265, 268 (1996). An appellate court must consider the instructions as a whole to determine whether the challenged instruction or part of an instruction is erroneous. *See id.* at 429, 543 N.W.2d at 268.

We conclude that the trial court's rejection of the proposed instructions was proper. As the court noted, the release only pertained to the defamation and tortious interference with contract claims; it specifically did not release the contract and other claims against GenStar, vicarious or otherwise. The evidence clearly

---

[9] GenStar will find no solace in the release. GenStar is only released from vicarious liability for defamation and interference with contract—the only claims lodged against McNichols.

established that McNichols was acting as the agent of GenStar and any statements McNichols made concerning insurance coverage were imputed to GenStar.

Moreover, the damages here are an indivisible injury arising from a breach of contract. The breach of contract stands and falls on its own. The tort actions were dismissed; Montana did not proceed on the tort theories. Thus, GenStar's analogy to successive tortfeasors simply does not wash. We are being asked to apportion blame for Montana's injuries between a tortfeasor and a party to a contract. However, McNichols was acting as GenStar's agent; it follows then that one question was sufficient to address whether GenStar breached the contract. This claim was clearly not released. We conclude that the trial court's rejection of the proposed instructions was not an erroneous exercise of discretion. We affirm.

## Protective Safeguard Provision

GenStar also argues that it would never have issued the policy if there were no sprinkler or alarm systems in the building and it should not be liable for the loss. GenStar contends that the testimony of an underwriter, Jose Marques, supports its position of no liability. Marques testified that if he had known from the beginning that the Sugar Shack did not have sprinklers or alarms, "[he] could have said [he] wasn't prepared to write it or [he] could have said that [he] wanted two or three times the premium." Montana then would have had to decide whether she wanted to pay for the coverage.

Montana defended this claim on the ground that the protective safeguard provision was included due to mistake. Montana testified that Oleneck asked her specifically if the Sugar Shack had sprinkler or alarm

systems and she specifically told him "no, it did not." According to Montana, their conversation went as follows: "[H]e says, do you have sprinkler system? I said no. Well, why—do you know you could get your premium cheaper if you had sprinkler system? I says, Rich, I don't have sprinkler systems." When Montana confronted Oleneck, he did not remember why the endorsement was included and thought he might have confused the Lake Geneva Sugar Shack with the Illinois Sugar Shack which did possess a sprinkler system.

The special verdict asked whether the protective safeguard endorsement was included in the policy as a result of a mistake by Oleneck, JAS Insurance, Horizon, GenStar and/or Montana. The jury attributed the mistake to Oleneck, JAS Insurance and Horizon. Accordingly, the policy was reformed to delete the protective safeguard endorsement from it and, ultimately, the jury determined that GenStar breached the contract and was liable to Montana for damages.

■

Again, "if there is any credible evidence which, under any reasonable view, fairly admits of an inference that supports a jury's finding, that finding may not be overturned." *Foseid*, 197 Wis. 2d at 782, 541 N.W.2d at 207. The jury determines the weight and credibility of testimony. *See Nowatske v. Osterloh*, 201 Wis. 2d 497, 511, 549 N.W.2d 256, 261 (Ct. App. 1996). Apparently, the jury found Montana's testimony that the inclusion of the provision was a mistake to be credible. This finding is supported by the evidence; accordingly, we affirm.

*Claims for Indemnity or Contribution*

Interdigitated with the above argument, GenStar also asserts claims for indemnification or contribution

against JAS Insurance and Oleneck with whom Montana had previously settled. GenStar argues that but for the action of the agents it would not have issued the policy and would not be liable to Montana. Therefore, GenStar is entitled to indemnification, and, as a matter of law, the trial court was required to have the jury apportion blame between those responsible for the mistake. We disagree.

This argument assumes that there can be apportionment between culpable parties in a breach of contract case. GenStar does not cite any authority for this proposition. This argument further presupposes that the injury here—the breach of contract—was successive as in the nature of successive tortfeasors. However, it was not. Rather, the breach was a single injury. Although the breach may have been caused by the collective acts of various parties, it was nevertheless a single injury. We affirm the trial court's denial of the proposed instruction.

## Jury's Finding of Agency

GenStar next questions whether JAS Insurance and Oleneck were GenStar's agents or Montana's brokers. GenStar first contends that the trial court erred in denying its motion for summary judgment. GenStar had argued that neither JAS Insurance nor Oleneck was GenStar's agent; rather, they were Montana's brokers and she must bear the consequences of their actions. Montana, however, maintained that both JAS Insurance and Oleneck were GenStar's agents. Factual disputes such as this are inappropriate for disposition at the summary judgment stage. *See* § 802.08, STATS.

In addition, GenStar challenges the jury's factual finding that JAS Insurance and Oleneck were its

agents. GenStar maintains that Horizon submitted the application, bound coverage and issued the policy and that neither JAS Insurance nor Oleneck had a contract with GenStar or was authorized to bind coverage for GenStar.

The evidence before the jury suggests otherwise. The binder lists JAS Insurance as the producer and is signed by Wolfinsohn as the "authorized representative." Wolfinsohn also testified that he received authorization to bind coverage from the president of Horizon Insurance who is unquestionably an agent of GenStar. Montana's expert testified that Horizon gave Wolfinsohn verbal power to bind coverage. GenStar's expert agreed that Horizon could give Wolfinsohn authority to issue the binder, but chose not to believe Wolfinsohn's representation.

"[I]f there is any credible evidence which, under any reasonable view, fairly admits of an inference that supports a jury's finding, that finding may not be overturned." *Foseid*, 197 Wis. 2d at 782, 541 N.W.2d at 207. The jury determines the weight and credibility of testimony. *See Nowatske*, 201 Wis. 2d at 511, 549 N.W.2d at 261. We conclude that these relationships constituted sufficient evidence supporting the jury's findings that both JAS Insurance and Oleneck were GenStar's agents. We affirm.[10]

---

[10] GenStar's argument that Oleneck and JAS Insurance/Wolfinsohn were "intermediaries" under § 628.02, STATS., is equally unavailing. Section 628.02(1)(b)7m states that "[a] person who acts solely as an agent, as defined in s. 616.71(1)" is not an intermediary. Section 616.71(1), STATS., defines an agent as "one who solicits the purchase of service contracts . . . or transmits for another any such contract, or application therefor, to or from the company, or acts or aids in any manner in the

## Evidentiary Rulings

GenStar argues that the trial court erred in refusing to grant a new trial because of errors in instructions and admission of evidence. GenStar challenges the trial court's refusal to instruct the jury that in answering the arson question it should not consider the failure of authorities to criminally prosecute Montana. GenStar further questions the trial court's allowing the evidence of GenStar's failure to return the unused portion of Montana's premium when it canceled the policy.

Even if it is generally accepted in courts throughout the United States that evidence of nonprosecution or even acquittal in a criminal arson proceeding is inadmissible in a civil suit arising out of the same event, Montana did not attempt to introduce this evidence; nor did she argue that she was not responsible for the fire based on the authorities' failure to prosecute her. She vehemently denied committing the arson, despite any suspicions to the contrary. Rather, GenStar elicited the testimony, over objections, of the criminal investigation and the fact that Montana had never been charged with arson.

We agree with Montana on two points. If error occurred, GenStar's counsel invited it and we will not review invited error. *See Shawn B.N. v. State*, 173 Wis. 2d 343, 372, 497 N.W.2d 141, 152 (Ct. App. 1992); *cf. Zindell v. Central Mut. Ins. Co.*, 222 Wis. 575, 582, 269 N.W. 327, 330 (1936) (appellant cannot complain of

---

delivery or negotiation of such contract, or in the renewal or continuance thereof." Oleneck negotiated and delivered the contract and JAS Insurance aided in the transmission of the contract and actually bound coverage. We conclude that Oleneck and JAS Insurance were agents acting on behalf of GenStar and not intermediaries working on behalf of Montana.

error induced by appellant). We also agree that the situation here is quite different from one where the judge rules evidence of nonprosecution is inadmissible because it may mislead the jury. Here, however, GenStar sought an instruction for the jury to ignore evidence which it obtained from its witness about the authorities' unwillingness to prosecute Montana for arson. We affirm the trial court's refusal to instruct the jury that it should not consider the fact that Montana had not been criminally prosecuted for arson.

GenStar's second argument fails as well. GenStar complains that the trial court erroneously allowed testimony that GenStar had cancelled the policy without giving the required statutory notice and that GenStar failed to return any unearned premium. The trial court allowed Wolfinsohn to testify that GenStar's cancellation notice did not give the requisite ten-day notice. *See* § 631.36(2)(b), STATS. Montana explained that she had paid the premium before the cancellation date, but GenStar refused to reinstate the coverage. Montana also stated that she was entitled to a refund of her payment, but that she never received a refund.

GenStar now maintains that this evidence was irrelevant, that it may have confused the jury as to whether GenStar breached its contract and that it was therefore prejudicial. Evidentiary rulings, particularly relevancy determinations, are left to the discretion of the trial court. When we review a trial court's discretionary decision, we consider only whether the trial court properly exercised its discretion, regardless of whether we would have made the same ruling. *See State v. Smith*, 203 Wis. 2d 288, 295, 553 N.W.2d 824, 827 (Ct. App. 1996).

Montana's theory of the case was that GenStar had decided from the beginning to deny her claim because GenStar believed the fire was due to arson. The evidence, according to Montana's theory of the case, further demonstrated GenStar's wrongful conduct towards Montana. We see no error in the trial court's evidentiary ruling; accordingly, we affirm.

### Request for New Trial

Lastly, GenStar maintains that it is entitled to a new trial on the basis of newly discovered evidence of Montana's continuing interest in Sugar Legacy Arabians. Motions for a new trial based on newly discovered evidence are submitted to the sound discretion of the trial court. *See State v. Terrance J.W.*, 202 Wis. 2d 496, 500, 550 N.W.2d 445, 447 (Ct. App. 1996). We will affirm the trial court's exercise of discretion as long as it has a reasonable basis and was made in accordance with accepted legal standards and the facts of record. *See id.*

> The trial court may grant a new trial based on newly discovered evidence only if the following requirements are met: (1) the evidence was discovered after trial; (2) the moving party was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; (4) the evidence is not merely cumulative to the evidence that was introduced at trial; and (5) it is reasonably probable that a different result would be reached at a new trial.

*Id.*

On motions after verdict, GenStar alleged that Montana asserted, in a totally separate eviction action, a continuing interest in Sugar Legacy Arabians which was inconsistent with her stance at trial that she had lost Sugar Legacy as a result of GenStar's failure to pay the claim. The trial court denied the motion. The court concluded that the grounds for GenStar's motion—Montana's interest in the farm as the intended beneficiary of a lease/option to purchase—arose after this case. GenStar's attorney agreed that the court "may be right," but that he had not had time to do discovery on the question. The basis of GenStar's motion for a new trial was based on speculation. Again, we see no error in the trial court's exercise of discretion in denying GenStar's motion for a new trial.

Costs are denied to both parties.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.