In re the Marriage of:

Kathleen Krejci, Petitioner-Respondent,

v.

John Krejci, Respondent-Appellant.

Court of Appeals

*No. 02–3376–FT. Submitted on briefs March 31, 2003.—
Decided June 24, 2003.*

2003 WI App 160

(Also reported in 667 N.W.2d 780.)

On behalf of the respondent-appellant, the cause was submitted on the briefs of *Timothy M. Doyle* of *Thrasher, Doyle, Pelish & Franti, Ltd.* of Rice Lake.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Anne E. Brown* of *A.E. Brown Law Office* of Eau Claire.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. CANE, C.J.   John Krejci appeals his divorce judgment, challenging the property division.[1] Before his marriage to Kathleen Krejci, John inherited "Krejci Kingdom," a lakeside resort consisting of six rental cabins and a residence. John argues that the trial court erroneously refused to enforce the parties' prenuptial agreement, which excluded the resort from the marital estate. John also contends that because the resort was inherited, none of its value should be included in the property division. He further claims that the trial

---

[1] This is an expedited appeal under WIS. STAT. RULE 809.17. All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

court's decision lacks a rational basis. We conclude the record supports the trial court's discretionary determination that enforcing the prenuptial agreement would be inequitable. We further conclude the court properly awarded Kathleen a portion of the resort's appreciated value. Because the record reveals a rational basis, we affirm the judgment.

## BACKGROUND

¶ 2.    John and Kathleen were married in 1984 and divorced in 2002. At the time of the divorce, both parties were in their fifties and in good health. John, who has a college degree in construction management, owned and operated the resort throughout the marriage. Kathleen, a licensed practical nurse, worked as a nurse and massage therapist and also helped run the resort. The parties had no children during the marriage, although Kathleen had ten children from a prior marriage who lived with the parties and were raised as their own.

¶ 3.    Before their marriage, John inherited "Krejci Kingdom" from his late wife's estate. The resort is the focus of the dispute before us on appeal. John's late wife purchased the resort in 1979 on land contract for $115,000. Following her death, John, as personal representative of her estate, conveyed title to a trust of which he is the beneficiary. The trust continued to make the land contract payments with income derived from other sources.[2] John later made payments with income

---

[2] John's late wife also owned a warehouse. After her death, the rent payments from the warehouse were used to pay the land contract payments on the resort until the warehouse was sold in the late 1980s and its proceeds divided between the deceased wife's minor children.

from the resort operation[3] and ultimately paid off the contract balance with funds he inherited from his mother.

¶ 4.   In 1984, shortly before his marriage to Kathleen, John retained an attorney to draft a prenuptial agreement. According to the attorney, John and Kathleen "wanted to see to it that there was an agreement that the resort would remain his and that whatever property they each brought to the marriage would be theirs respectively." The attorney specifically told Kathleen that he would represent John and that she was free to retain her own counsel, but she declined. The prenuptial agreement stated that the property owned by each party as of the date of marriage shall remain that party's sole property, including any "accessions and appreciation" in said property.

¶ 5.   Kathleen testified that she entered into the prenuptial agreement to foreclose any possibility that her former husband could make a claim based upon any potential interest she might obtain in the resort due to her marriage to John. The parties did not exchange written financial information when they entered into the prenuptial agreement. They each testified that the resort was the only asset John had at the time of the marriage and that Kathleen had no significant assets. In 1984, when John and Kathleen married, property tax

---

[3] In his reply brief, John states that he "made the monthly payments with income from the resort operation." He does not cite to the record, *see* WIS. STAT. RULE 809.19(1)(e), but this fact is not disputed.

bills showed the resort's value to be $151,000. An appraisal done at the time of the divorce indicated a value of $398,000.[4]

¶ 6. The parties considered the resort their home. Kathleen testified that the prenuptial agreement was never mentioned or discussed throughout their marriage. She further testified that when making their joint wills, the resort was considered "ours."[5]

¶ 7. Each May through September, the parties rented out the resort's six cabins. Kathleen testified that she worked in nursing homes from fall to spring, but in the spring and summer she and John "ran [the resort] together." She and her children cleaned cabins and boats, attended to guests, did yard work, sold bait, did laundry and in general helped run the resort. Kathleen was not paid for her work at the resort. She testified that the resort business steadily improved over the years.

¶ 8. Although John disputed the amount of work that Kathleen performed, he agreed she did the resort's laundry. He testified that he paid the children to clean. Nonetheless, John characterized their relationship as a partnership. He testified:

> [I]t isn't just the cut-and-dried situation like she was an employee, because she wasn't. . . . To me it was just a partnership of making a marriage work, trying to do whatever we could do. She worked, I worked when necessary to provide enough income to raise the family and make ends meet.

---

[4] Title to the resort was never conveyed and remains in the trust. The parties stipulated that an appraisal showing the $398,000 value may be entered into evidence.

[5] Their wills referred to the resort as one that "we own."

¶ 9. The parties built a large addition to the main house as quarters for the children, consisting of five bedrooms, a bath and a living area. John did much of the labor himself. He testified that the addition cost between "20, 25, $30,000, somewhere in there." He explained that some came from an inheritance from his mother, but "mostly it came from just the proceeds of the resort." In addition, the parties replaced roofs on all the buildings, put in two new drain fields and a new well pump. Also, a seawall and cabin furnishings were replaced over the years.

¶ 10. When asked why the resort's value is so much higher now than at the time of the marriage, John testified:   "I guess its lakeshore. Value of land has gone up dramatically." No real estate appraiser testified, and no other testimony was offered on real estate market conditions.

¶ 11. Throughout their marriage, the parties did not attempt to keep their properties separate. Kathleen's inheritance[6] went into a savings account and was used for a variety of purposes, including her massage training, forty acres of land that was later sold, and loans to the children. The land sale proceeds were used to purchase a commercial building in Chetek where Kathleen operated her massage therapy practice. It is not disputed that the parties' equity in the commercial building equals $23,000. Kathleen testified that before 1992, she used her outside income to support the

---

[6] The trial court found that Kathleen inherited approximately $90,000. Although John testified that he believed Kathleen's inheritance was closer to $65,000, the court's decision indicates a precise figure is not critical to its analysis. In any event, John does not develop an argument challenging the court's finding of fact.

children and, after 1992, when she started her massage therapy practice, all her income went into the joint "Krejci Kingdom" account.

¶ 12. John testified he brought an additional $5,000 to the marriage and that it was deposited into "the same account that Kathy's inheritance went into" and "I can't really tell you where all – each individual dollar was spent." John also inherited $25,000 following his mother's death. As indicated, he testified that part of the money paid for the addition and part paid off the balance due on the land contract for the resort.

¶ 13. At the conclusion of the trial, the court found that the parties had actual knowledge of one another's financial circumstances at the time of the execution of the prenuptial agreement and, consequently, their failure to submit written financial disclosure to one another did not invalidate the agreement. The court also found that John worked full time operating the resort and Kathleen's efforts were closer to part-time. Nonetheless, the court determined that during their eighteen-year marriage, the parties "worked hand in hand to run a resort."

> Mrs. Krejci was involved for eighteen years in maintaining that property. She didn't get paid, she didn't get a separate check for all the work she did there. . . . It wasn't written off by this Krejci trust paying her or Mr. Krejci for this work that was done . . . . She was treated like a partner in this operation and she put herself into it just as Mr. Krejci did.

¶ 14. The court also noted that the parties took no steps to keep their properties separate. The court found that John inherited $25,000 and Kathleen inherited $90,000 during the marriage and that it would be inequitable to separate out the resort, but hold that

Kathleen's inheritance was subject to division. Consequently, the court concluded that it was inequitable to enforce the prenuptial agreement at the time of the divorce.

¶ 15.   The court recognized that as inherited property and in the absence of hardship, the resort was not subject to division under Wis. Stat. § 767.255(2)(a). Nonetheless, it concluded that Kathleen was entitled to a portion of its appreciated value. The court awarded John the resort, subject to an $80,000 offset to Kathleen. In addition, it awarded Kathleen the parties' commercial building in Chetek, subject to debt. Each party received personal property in their possession and one-half the value of life insurance policies. The total balancing payment John was ordered to pay Kathleen equaled $87,846.50. No maintenance was awarded to either party.

## DISCUSSION

### Prenuptial agreement

■

¶ 16.   John argues that the trial court erroneously determined that enforcing the parties' prenuptial agreement would be inequitable. We disagree. Because of the significantly changed circumstances following the execution of the agreement and because the agreement as applied at divorce no longer comports with the parties' reasonable expectations, the court properly determined it was inequitable and therefore not binding.

¶ 17.   When fashioning a property division, Wis. Stat. § 767.255(3)(L) requires the trial court to consider:

> (L) Any written agreement made by the parties before or during the marriage concerning any arrangement

for property distribution; such agreements shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party. The court shall presume any such agreement to be equitable as to both parties.

¶ 18. The circuit court's determination of inequity under Wis. Stat. § 767.255(3)(L), as its property division determination under § 767.255, is discretionary. *See Button v. Button*, 131 Wis. 2d 84, 99, 388 N.W.2d 546 (1986). A discretionary determination will be upheld if the circuit court considered the relevant law and facts and set forth a process of logical reasoning. *Id.*

¶ 19. A prenuptial agreement is equitable if: (1) each spouse made fair and reasonable disclosure to the other of his or her financial status; (2) each spouse has entered into the agreement voluntarily and freely; and (3) the substantive provisions of the agreement dividing the property upon divorce are fair to each party. *Brandt v. Brandt*, 145 Wis. 2d 394, 414, 427 N.W.2d 126 (Ct. App. 1988). Here, the court based its determination on the third requirement and determined that the agreement was unfair, not at the inception, but at the time of the divorce.[7]

¶ 20. The third requirement assures substantive fairness. *Id.* In the context of a marital agreement: Substantive fairness is an amorphous concept. the courts must determine substantive fairness on a case by case basis. *Id.* at 414–15. An agreement fair at execution is not unfair at divorce just because its application

---

[7] Although the parties addressed the first and second requirements, we limit our discussion to the third dispositive element.

results in an unequal property division or one that the court might not order under Wɪs. Sᴛᴀᴛ. 767.255. *Id.* at 415. If, however, there are significantly changed circumstances after the execution of an agreement and the agreement as applied at divorce no longer comports with the reasonable expectations of the parties, an agreement which is fair at execution may be unfair to the parties at divorce. *Id.*

¶ 21. The case of *Warren v. Warren*, 147 Wis. 2d 704, 708–09, 433 N.W.2d 295 (Ct. App. 1988), elaborated on the concept of changed circumstances, holding that "for a change of circumstances to be uncontemplated, the event must not have been reasonably foreseen by the parties prior to or at the time of the making of the agreement. Changed circumstances have been found to include that the marital agreement was never resurrected or discussed during the parties various estate planning activities and that the parties did not implement separate estate planning. *Brandt*, 145 Wis. 2d at 416.

¶ 22. In *Brandt*, we did not enforce the prenuptial agreement, observing that the agreement was so long forgotten or ignored by the parties and their finances managed to the satisfaction of all in the interim. *Id.* at 415. Also,

> More importantly, the commingling of the parties assets and the resultant inability to trace makes a meaningful enforcement of the marital agreement impossible. A partys request to enforce a marital agreement carries with it, we conclude, a concomitant responsibility to trace the property such that a reliable identification and valuation of the assets governed by the agreement can be made.

*Id.* at 416.

¶ 23.  John argues that *Brandt* does not apply here because the resort was kept entirely separate. We are not persuaded. In *Haldemann v. Haldemann*, 145 Wis. 2d 296, 301, 426 N.W.2d 107 (Ct. App. 1988), we ruled that "an asset may be part separate property of one spouse and part of the martial estate subject to division."

> The equitable distribution-partnership concept of marriage recognizes that a marriage possesses an important, intangible asset:  the capability of both spouses to contribute to the marriage and to the acquisition of property through their labor. To the extent that either spouse is remunerated for his or her labor during the marriage, the remuneration is marital property.

*Id.* at 302.

¶ 24.  Thus, if during the marriage, both spouses contribute to the acquisition of property through their abilities and efforts, that property is part of the marital estate. The property acquired may be the appreciation in value of an asset separately owned by one of the spouses. *Id.* Consequently, if it is shown that inherited property has appreciated in value during the marriage due to the efforts of both the owning and nonowning spouses, that appreciation will be included in the marital estate. *Richmond v. Richmond*, 2000 WI App 25, ¶ 7, 250 Wis. 2d 647, 640 N.W.2d 220.

¶ 25.  Here, the record supports the courts finding that the resorts appreciation was due to a large degree to the efforts of both parties. Although they dispute the extent of Kathleen's efforts, it is undisputed that the parties operated the resort together. When the trial court found that the parties operated the resort for

300

eighteen years as a partnership, it essentially found that Kathleen's efforts were beyond those of customary spousal obligations. *See id.* (The efforts of the nonowning spouse must be unusual and uncompensated only in the sense that something more than performance of usual and normal marital responsibilities is required.). The weight and credibility of Kathleen's testimony is a matter for the trial court, not the appellate court, to determine. *See* Wis. Stat. § 805.17(2). We are satisfied that the record supports the trial court's determination that Kathleen's contributions were more than merely maintaining the marital relationship and performing the customary obligations of one spouse to the other.

¶ 26.  The record also supports the court's implicit finding that both parties' efforts resulted in the appreciation in the resort's value from the time of the marriage. The parties generated income through their efforts running the resort business. It is undisputed that income from the resort was used, in part, to build an addition to the marital home, make other improvements, and pay a portion of the land contract payments. As a result, marital property was invested in the inherited resort.[8]

---

[8] John contends that "from the entire transcript, it appears that such improvements were funded with income from the resort business, as managed by John." He implies that this contention supports his claim the resort was kept separate. John cites no authority for the proposition that his resort income was nonmarital. Also, his argument ignores that "to the extent that either spouse is remunerated for his or her labor during the marriage, the remuneration is marital property." *Haldemann v. Haldemann*, 145 Wis. 2d 296, 302, 426 N.W.2d 107 (Ct. App. 1988). Consequently, we reject his argument.

¶ 27. The record reveals that the improvements to the residence were significant. An improvement is "A permanent addition to or betterment of real property that enhances its capital value and that involves the expenditure of labor or money and is designed to make the property more useful or valuable as distinguished from ordinary repairs." *Id.* at 305 (citation omitted). The record fails to support a claim that the addition to the residence as well as the septic systems, well and seawall were routine upkeep. *See Spindler v. Spindler,* 207 Wis. 2d 327, 337, 340, 558 N.W.2d 645 (Ct. App. 1996). The record permits the court to infer that the parties' efforts and expenditures resulted in an unidentified portion of the resort's appreciated value.

¶ 28. John also claims that the entire appreciation was due to the increase in value of lakeshore property. Where the appreciated value of separate property is due solely to general economic conditions, such as inflation or normal appreciation of real estate values, the property remains separate. *Plachta v. Plachta,* 118 Wis. 2d 329, 334, 348 N.W.2d 193 (Ct. App. 1984). Here, however, John's argument lacks a factual basis. He points to no testimony to support his argument, other than his own unsubstantiated opinion. John did not establish himself as an expert who would be able to explain real estate market conditions. The record entitled the court to infer that the resort's appreciation was not caused merely by market conditions.

¶ 29. Here, the court reasonably determined that enforcement of the prenuptial agreement would be inequitable within the meaning of WIS. STAT. 767.255(3)(L). The record supports its findings that

over the course of John and Kathleens eighteen-year marriage, the marital agreement was never resurrected or discussed and was not brought up during estate planning activities. *See Brandt*, 145 Wis. 2d at 416. Also, the parties combined their various resources, including inheritances, savings, and incomes. They operated the resort as a partnership. These facts reinforce the courts determination that the marital agreement was ignored. In addition, although the resort remained separately titled, the record supports the courts implicit determination that the parties combined efforts and labors contributed to the appreciation in the resorts value in a way that cannot be separately identified. Accordingly, under *Brandt*, the record supports the courts determination that enforcement of the agreement that excluded the resorts appreciated value from property division would have been inequitable. Thus, the trial court reasonably exercised its discretion by ruling that the prenuptial agreement was not binding.

*Inherited Property*

¶ 30.   John argues that the resort's identity and character has never changed and, consequently, even if the prenuptial agreement was unenforceable, the resort is not subject to division under WIS. STAT. § 767.255.[9] Although there is no dispute that the resort was inher-

---

[9] Under WIS. STAT. § 767.255, any property shown to have been inherited is not subject to division except if it would create a hardship. Here, there is no claim of hardship. It is, however, unnecessary to show hardship if the appreciation in value of separate property resulted "from the efforts and abilities of the nonowning spouse." *Haldemann*, 145 Wis. 2d at 301.

ited, we are satisfied the court reasonably exercised its discretion when it divided the resort's appreciated value.

¶ 31. Inherited or gifted property must retain its character and identity if its exempt status is to be preserved. *Brandt,* 145 Wis. 2d at 408–09. Character addresses the manner in which the parties title or treat the exempt assets. *Id.* at 410. Changing the character of individual property can serve to transmute it to marital property. *Id.* Identity addresses whether the asset has been preserved in an identifiable form so that it can be meaningfully valued and assigned. *Id.* at 411. Commingling of inherited and marital assets is not necessarily fatal to the exempt status. *Id.* at 412. The critical inquiry is whether despite the commingling, the inherited component of the asset can nonetheless be identified. *Id.*

¶ 32. The party seeking exclusion of inherited or gifted property must prove that it has retained its character and identity. *Id.* at 408–09. Once the recipient of inherited property has met these requirements, the opposing party has the opportunity to establish by sufficient countervailing evidence the property is not inherited, or has otherwise lost its exempt status because its character or identity has not been preserved. *Id.*

¶ 33. Here, the parties income and labors were invested in the resort, and evidence fails to demonstrate how their added investment can be specifically traced and identified. If it is shown that inherited property has appreciated in value during the marriage due to the efforts of both the owning and nonowning spouses, that

304

appreciation will be included in the marital estate. *Richmond*, 250 Wis. 2d 647, 7. That is what the trial court did here.

¶ 34. John argues, nonetheless, that title has never transferred from the trust. This argument is unavailing. While a change in the title from sole to joint ownership affects the character of the property, *Weiss v. Weiss*, 122 Wis. 2d 688, 692, 365 N.W.2d 608 (Ct. App. 1985), maintaining separate title is not dispositive. *See Haldemann*, 145 Wis. 2d at 301. We conclude that the trial court properly determined that the resorts appreciated value was subject to division under WIS. STAT. 767.255.

*Other Errors*

¶ 35. Finally, John argues that the trial courts property division lacks a rational basis. He contends that the record fails to support the courts finding that the parties did not understand the meaning of the term accession used in the prenuptial agreement. We conclude that the courts observation does not call for reversal. The courts decision not to enforce the prenuptial agreement rests upon substantive fairness at the time of the divorce, not the parties understandings at the time of their marriage.

¶ 36. John further argues that *Haldemann* must be distinguished because in that case, the husbands efforts actually imparted value to the real estate. Here, he contends, Kathleen Krejcis efforts at the resort consisted of no more than washing sheets, greeting customers and tending bar. This argument attacks the weight and credibility of Kathleens testimony. The trial

court, as the sole arbiter of credibility, was entitled to accept Kathleens testimony to the effect that the parties operated the resort as a partnership. *See* WIS. STAT. 805.17(2).

■■■

¶ 37. Next, John argues that the court provided no explanation why it awarded Kathleen approximately 32% of the resort's appreciated value. He further claims that the court erroneously ordered that Kathleen was entitled to the $23,000 equity in the parties' jointly owned commercial building without explanation. We disagree.

¶ 38. The court stated that rather than divide the resort's appreciation in half, it would award Kathleen the commercial building and the equivalent of $80,000. The court noted that this division would be fair because it took into account Kathleen's inheritance invested in part into the commercial building. Also, it would give John "more than half of the appreciation of the [resort] property, taking into account his probably full-time effort at that as opposed to her part-time effort in it."

■■■

¶ 39. WISCONSIN STAT. § 767.255 identifies the factors the court may consider when altering the presumptive equal division of marital assets and liabilities. The weight and effect to be given each of these considerations is for the trial court to determine. *Fuerst v. Fuerst*, 93 Wis. 2d 121, 131, 286 N.W.2d 861 (Ct. App. 1979). Here, the court weighed the parties' respective contributions, *see* WIS. STAT. § 767.255(3)(b) and (d), and appropriately awarded Kathleen's share based upon its findings. Because the court considered appropriate factors and reached a reasonable decision, we do not overturn it on appeal.

*By the Court.*—Judgment affirmed.