COURT OF APPEALS
DECISION
DATED AND FILED

July 29, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal Nos.   **2023AP2427**
**2024AP541**

Cir. Ct. No. 2021FA237

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

IN RE THE MARRIAGE OF:

THADDEUS JAMES LINDER,

PETITIONER-APPELLANT,

V.

BONNIE JEANNE GIORGIO,

RESPONDENT-RESPONDENT.

APPEALS from a judgment and an order of the circuit court for Marathon County: LAMONT K. JACOBSON, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).

¶1 PER CURIAM. These appeals arise from a divorce action between Thaddeus James Linder ("Thad") and Bonnie Jean Giorgio ("Bonnie").[1] Thad appeals from the parties' divorce judgment and from an order denying his motion for reconsideration.[2] Thad contends that the circuit court erred by: (1) concluding that the parties' marital property agreement was unenforceable; and (2) concluding that Thad's interest in a business—which Thad had received as a gift before the parties' marriage—would be included in the marital estate and subject to division. We reject Thad's arguments and affirm.

## BACKGROUND

¶2 Thad and Bonnie were married on October 14, 2006. Thad filed for divorce on June 8, 2021, after nearly 15 years of marriage. At the time of filing, the parties had two minor children.

¶3 The parties reached a partial marital settlement agreement regarding legal custody and physical placement. They were not able to reach an agreement, however, regarding the issues of property division, maintenance, and child support. A contested divorce trial regarding those issues took place during August 2023. As relevant to these appeals, at trial, the parties disputed whether a marital property agreement ("MPA") that they had signed prior to their marriage

---

[1] For ease of reading, and following the parties' lead, we refer to the parties by their first names throughout the remainder of this opinion.

[2] Thad filed separate notices of appeal from the divorce judgment and from the order denying his motion for reconsideration. We subsequently granted Thad's motion to consolidate the two appeals. Thad's appellate briefs, however, do not separately address the circuit court's denial of his motion for reconsideration. Because Thad has failed to develop an argument that the court erred by denying that motion, we will not separately address it in this opinion. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals need not address undeveloped arguments).

2

was enforceable and whether Thad's interest in L&L Properties, LLC ("the LLC"), which he had received as a gift before the marriage, should be included in the marital estate and subject to division.

¶4    At trial, evidence was introduced that Thad proposed to Bonnie in February 2006. Thereafter, in mid-2006, Bonnie moved to Wisconsin and became pregnant with the parties' first child. In advance of the parties' October 2006 wedding, Thad's mother insisted that Thad and Bonnie sign an MPA. Thad testified that the "intent" of the MPA was to protect his interest in the LLC, which his parents had created in 2002 for the purpose of owning and leasing residential property—specifically, apartment buildings. At the time the LLC was formed, Thad's parents gave both Thad and his sister a 25% interest in the LLC. An exhibit attached to the MPA showed that Thad's 25% interest had a value of $579,000 in October 2006.

¶5    Thad testified that his mother hired an attorney to draft the MPA in September 2006 and paid for the attorney's services. According to Thad, it was his mother who told the attorney what the MPA should say. As relevant here, the MPA provided that Thad's "ownership in [the LLC] and any other entities formed in the future with his parents and/or his sister shall remain his individual property."

¶6    Thad and Bonnie signed the MPA on October 6, 2006—eight days before their wedding. Bonnie was three months pregnant at that time. Bonnie testified that the day before she signed the MPA, Thad's family told her that she needed to sign it or "there would be no wedding." According to Thad, Bonnie did not want to sign the MPA, and he "told her … that's fine, we just won't get married." Thad and Bonnie both testified that on the date of signing, various

3

wedding expenses had already been paid, and that money would have been lost if the wedding did not go forward. Bonnie testified that under these circumstances, she was "extremely emotional" and "felt pressured" to sign the MPA. She further testified that she signed the agreement "to make sure [she] got married."

¶7 Bonnie testified that she first saw the MPA on the day she signed it—in other words, eight days before the parties' wedding. Thad's testimony on the same point was somewhat contradictory. Initially, Thad testified that he saw a draft of the MPA "about a week before the signature." However, he then answered in the affirmative when asked whether he agreed with Bonnie's testimony "that the two of you saw the agreement *about a week before your marriage.*" (Emphasis added.) Later, though, Thad agreed with the statement that a draft of the MPA "came from the lawyer approximately eight days before you signed it," and he therefore asserted that a claim that Bonnie "didn't have time to look at it until the date of signature" was "not true."

¶8 Bonnie testified that on the day she and Thad signed the MPA, Thad drove her to his attorney's office, where Thad's mother joined them. Thad and his mother consulted with the attorney while Bonnie waited in a reception area. Bonnie testified that she "was bawling, crying, very emotional," and was "pregnant" and "hormonal."

¶9 After Thad and his mother met with the attorney, Bonnie was brought into a conference room with them, and the attorney read the MPA aloud to her. Bonnie testified that she did not understand what the attorney was reading. In particular, Bonnie testified that she did not understand the provision in the MPA stating that Thad's interest in the LLC would remain his individual property. She conceded, however, that she understood the word "individual" to mean "[t]hat it's

4

one person's" and that she understood the word "property" to mean "[s]omething you have in your possession," including real estate and businesses.

¶10 Bonnie testified that at the time she signed the MPA, she had an eleventh-grade education. She also testified that she did not believe she had adequate time to review the MPA before signing it. Bonnie further testified that she wanted to retain her own attorney to review the MPA, but she did not have the funds to do so. She testified that Thad told her she could not have an attorney, and he did not offer her any money to pay for an attorney. Thad denied telling Bonnie that she could not have her own attorney, but he conceded that he did not offer to pay for an attorney to represent her. Instead, he told Bonnie that she could borrow money from her family to pay for an attorney.

¶11 Both parties introduced evidence at trial regarding Bonnie's work for the LLC during the marriage. Bonnie testified that from the time she moved to Wisconsin in 2006 until she went back to school in 2014, she worked exclusively for the LLC and did not have any other employment. According to Bonnie, Thad's family "didn't want [her] to have another job" because the women in the family—that is, Bonnie, Thad's mother, and Thad's sister—"worked at the apartments and the men had real jobs and provided the insurance."

¶12 Bonnie testified that she worked for the LLC full time, 40 hours per week, and that her work included construction tasks such as running cable wires, laying tile, applying grout, applying orange peel texture to walls, and painting. She also prepared apartments for new tenants, which involved "detailed cleaning" and other tasks like ripping up carpet. In addition, Bonnie deposited rent checks, showed apartments to potential tenants, prepared leases, met with tenants, performed background checks, and handled calls from tenants. She also assisted

with the initial landscaping of the LLC's properties by spreading dirt, laying felt, buying and planting plants, shoveling and moving rock, and laying brick as edging. Bonnie testified that she also mowed lawns, trimmed plants, and whacked weeds. In the winter, she assisted with snow removal and salting sidewalks. She also performed miscellaneous tasks such as resetting door codes and meeting with locksmiths, dealing with restoration companies when units flooded, waiting on site for delivery and installation of appliances and carpet, replacing trim, and handling additional responsibilities when Thad's parents were out of the country.

¶13    Bonnie testified that she worked for the LLC unpaid for eight years—that is, from 2006 until she went back to school in 2014. After she went back to school, she continued working for the LLC but insisted on being paid, and the LLC began paying her ten dollars an hour. Bonnie explained that she wanted to be paid because she was doing substantial work for the LLC but was not receiving a W-2, which would affect her future Social Security benefits.

¶14    Thad disputed the extent of Bonnie's work for the LLC. He conceded that Bonnie performed tiling work, deposited checks and showed apartments when his mother was out of town, ran cable wires, cleaned apartments, assisted with landscaping, and occasionally mowed lawns and shoveled snow. He asserted, however, that Bonnie's work for the LLC was "nowhere near the 40 hours a week she says she put in." Thad also testified that Bonnie stopped working for the LLC after going back to school because she had a "big fall[ing] out" with Thad's sister.

¶15    Thad's father confirmed that Bonnie cleaned apartments and common areas for the LLC, showed apartments, assisted with landscaping and tiling, and performed other tasks when he and his wife were away. Thad's sister

testified that Bonnie provided "a little bit" of help with cleaning and landscaping at the beginning of the parties' marriage, that she helped Thad with tiling, and that she showed apartments "a few times." Both Thad's father and sister testified that Bonnie had a "falling out" with Thad's sister in about 2013 or 2014, after which Bonnie stopped working for the LLC.

¶16 Finally, evidence was presented at trial regarding the LLC's growth during the parties' marriage. It was undisputed that during the course of the marriage, the LLC built at least 14 new apartment buildings, converted a fitness center to an apartment building, and built a workshop. An appraisal was entered into evidence showing that the total value of the LLC's residential real estate at the time of trial was approximately $25,600,000, making the value of Thad's 25% interest $6,400,000.

¶17 After making various factual findings, which are discussed in greater detail below, the circuit court determined that Thad and Bonnie's MPA was invalid under the test set forth in *Button v. Button*, 131 Wis. 2d 84, 99, 388 N.W.2d 546 (1986). Having set aside the MPA, the court then considered whether "Thad's interest in [the LLC] … should be excluded from the marital estate for purposes of property division because it is a gifted asset not subject to division." Based on the court's factual findings—which, again, are discussed in detail below—the court determined that

> [t]he increased value of [the LLC] was due to the efforts of all family members, including Bonnie. Similar to [*Krejci v. Krejci*, 2003 WI App 160, 266 Wis. 2d 284, 667 N.W.2d 780], the parties' labor was invested in [the LLC] and there exists no way to determine how that investment could be specifically traced and identified. The Court is satisfied that [the LLC] should be included in the marital estate, or, rather, [Thad's] ownership share should be included in the marital estate.

7

¶18    The circuit court subsequently entered a written divorce judgment, which memorialized its oral rulings regarding the MPA and Thad's interest in the LLC. Partially as a result of those rulings, the divorce judgment required Thad to make an equalization payment of $2,045,266 to Bonnie. Thad now appeals, arguing that the court erred by invalidating the MPA and by including his interest in the LLC in the marital estate.[3]

**DISCUSSION**

**I. Validity of the MPA**

¶19    A written agreement "made by the parties before or during the marriage concerning any arrangement for property distribution … shall be binding upon the court except that no such agreement shall be binding where the terms of the agreement are inequitable as to either party." WIS. STAT. § 767.61(3)(L). "The court shall presume any such agreement to be equitable as to both parties." *Id.* However, a marital property agreement is inequitable, and therefore unenforceable, if it fails to satisfy any of the following requirements: (1) each spouse made a fair and reasonable disclosure of his or her financial status to the other spouse; (2) each spouse entered into the agreement voluntarily and freely;

---

[3] We pause to note that Thad's appellate briefs do not comply with WIS. STAT. RULE 809.19(8)(bm) (2023-24), which requires a brief to "have page numbers centered in the bottom margin using Arabic numerals with sequential numbering starting at '1' on the cover." Our supreme court has explained that this pagination requirement "will match the page number to the page header applied by the eFiling system, avoiding the confusion of having two different page numbers." S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021). We admonish counsel that future violations of the Rules of Appellate Procedure may result in sanctions. *See* WIS. STAT. RULE 809.83(2) (2023-24).

All references to the Wisconsin Statutes are to the 2023-24 version.

and (3) the substantive provisions of the agreement are fair to each spouse. ***Button***, 131 Wis. 2d at 99.

¶20 A circuit court's "determination of inequitableness … requires the circuit court to exercise its discretion." ***Id.*** We will uphold the court's discretionary determination as long as the court "considered the relevant law and facts and set forth a process of logical reasoning." ***Id.*** Any factual findings underlying the court's discretionary decision will be upheld unless they are clearly erroneous. ***Covelli v. Covelli***, 2006 WI App 121, ¶13, 293 Wis. 2d 707, 718 N.W.2d 260.

¶21 In this case, the circuit court determined that the MPA was invalid because it failed to satisfy the second ***Button*** factor—i.e., because Bonnie did not enter into the agreement voluntarily and freely. *See* ***Button***, 131 Wis. 2d at 99. The "relevant inquiry" under the second ***Button*** factor is "whether each spouse had a meaningful choice" in entering into the agreement. ***Id.*** at 95. Factors relevant to this determination include whether each party was represented by independent counsel, whether each party had adequate time to review the agreement, whether the parties understood the agreement's terms and their effect, and whether the parties understood their financial rights in the absence of an agreement. ***Id.*** at 95-96.

¶22 In light of these factors and the circuit court's factual findings, we conclude the court did not erroneously exercise its discretion by determining that Bonnie did not enter into the MPA voluntarily and freely. The court found that Thad was represented by counsel when he signed the MPA—specifically, an attorney paid for by his mother—but Bonnie was unrepresented. Although the court acknowledged that Bonnie could have theoretically obtained her own

attorney, the court found that it would have been "unrealistic" for her to do so, given the short time before the parties' wedding and Bonnie's financial circumstances.

¶23    The circuit court also found that a draft of the MPA was first "available" about eight days before the parties signed it.[4]  In addition, the court cited Bonnie's testimony that although Thad's attorney read the MPA to her, she did not fully understand its terms.  The court also cited Bonnie's testimony that she was crying in the reception area while waiting to speak to Thad's attorney.  Furthermore, the court emphasized that Bonnie was three months pregnant with the parties' child at the time she signed the MPA, that she had only an eleventh-grade education, and that Thad's family had pressured her to sign by telling her that "there would be no wedding" if she did not do so.  Thus, the court found that Bonnie's only alternative to signing the MPA was "being an unwed mother and [facing] the embarrassment of canceling a wedding" that was scheduled to occur in only eight days.  The court reasonably concluded that, under these circumstances, Bonnie had no "meaningful choice" in signing the MPA, and, as a result, she did not do so voluntarily and freely.  *See id.* at 95.

¶24    On appeal, Thad emphasizes that the circuit court discussed only one of the ***Button*** factors in support of its determination that the MPA was invalid.  To be enforceable, however, the MPA needed to satisfy all three of the ***Button*** factors.  *See **id.*** at 99 (stating that an MPA is inequitable "if it fails to satisfy any one of the three" ***Button*** factors); *see also **Krejci***, 266 Wis. 2d 284, ¶¶19-29

---

[4] While the circuit court found that a draft of the MPA was first "available" about eight days before the parties signed it, the court did not specifically find that a draft was "available" *to Bonnie* at that time.

(affirming the circuit court's determination that an MPA was inequitable based on the third ***Button*** factor and declining to address the parties' arguments regarding the first and second factors). Thus, the court's determination that the MPA failed to satisfy the second ***Button*** factor provided a sufficient basis for the court to invalidate the MPA.

¶25 Citing ***Gardner v. Gardner***, 190 Wis. 2d 216, 527 N.W.2d 701 (Ct. App. 1994), Thad also argues that Bonnie had sufficient time to consider the MPA before signing it. ***Gardner***, however, is materially distinguishable.

¶26 In ***Gardner***, William and Dianne began dating in 1983, and when they began to discuss marriage in June 1985, "William told Dianne he would not consider marriage unless they reached a written agreement protecting his property." ***Id.*** at 230, 232. After William made that statement, Dianne began planning a wedding. ***Id.*** at 232. While doing so, she was also negotiating an MPA with William. ***Id.*** Dianne was represented by independent counsel and "attended two counseling sessions devoted to the MPA." ***Id.*** She and her attorney received a draft of the MPA in early August 1985, five days before the wedding. ***Id.*** "During subsequent negotiations, Dianne was successful in getting the MPA revised several times until she had doubled her payout in the event of divorce." ***Id.*** at 232-33. Furthermore, Dianne conceded that she "understood the terms of the agreement and their [e]ffect, and understood her financial rights in the absence of an MPA." ***Id.*** at 232. On these facts, we affirmed the circuit court's discretionary determination that the MPA was not inequitable, concluding that Dianne had a "meaningful choice" in signing the MPA because there was "no evidence to support a conclusion that [she] was coerced, rushed or, in any manner, forced to sign" it. ***Id.*** at 233.

¶27    Thad asserts that he and Bonnie "received the [MPA]—at a minimum—at least nine days prior to the wedding," which "includes several additional days that were absent from the five-day timeline in *Gardner*." Be that as it may, unlike Bonnie, the wife in *Gardner* was represented by counsel, participated in "counseling sessions" regarding the MPA, successfully negotiated revisions to the MPA before signing it, and conceded that she understood the MPA's terms and their effect. Given these distinctions, *Gardner* does not compel a conclusion that Bonnie had sufficient time to consider the MPA before signing it.

¶28    Thad also argues that the circuit court erred by relying on Bonnie's eleventh-grade education to conclude that she did not understand the MPA and, therefore, did not voluntarily sign it. In support of this claim, Thad cites Bonnie's testimony regarding her understanding of the words "individual" and "property" at the time she signed the MPA. The fact that Bonnie understood the common meanings of those words, however, does not establish that she understood the legal term of art "individual property" or understood the effect that the MPA would have on her rights in the event of a divorce.

¶29    In addition, Thad cites Bonnie's ability to read and write, the fact that she was 24 years old when she signed the MPA, and the ease with which she completed additional education following the parties' marriage as factors showing "that Bonnie is an intelligent woman who had the capacity to understand the terms of the [MPA] at the time she signed [it]." Thad's argument in this regard essentially asks us to reweigh the evidence presented to the circuit court, which we lack the authority to do. *See Dickman v. Vollmer*, 2007 WI App 141, ¶14, 303 Wis. 2d 241, 736 N.W.2d 202. In its oral ruling, the court credited Bonnie's testimony that she did not fully understand the MPA's terms. That credibility

determination is not clearly erroneous, particularly given the evidence that Bonnie had an eleventh-grade education at the time she signed the MPA, was three months pregnant and very emotional, and had only a limited opportunity to review the MPA before signing it.

¶30    Thad also asserts that Bonnie's "lack of representation … does not in and of itself bar a finding that Bonnie voluntarily signed the [MPA]." The circuit court's determination that Bonnie did not voluntarily sign the MPA was not based solely on Bonnie's lack of representation, however. Instead, the court properly considered Bonnie's lack of representation as one factor in its analysis of whether her decision to sign the MPA was free and voluntary.

¶31    Relatedly, Thad asserts that although Bonnie was not represented when she signed the MPA, the evidence shows that she had the *opportunity* to retain counsel but declined to do so. This argument ignores the circuit court's specific finding that although Bonnie theoretically could have retained counsel before signing the MPA, it would have been "unrealistic" for her to do so, given the short time before the wedding and her financial circumstances. Based on the evidence presented at trial, the court's finding in that regard is not clearly erroneous.

¶32    Finally, Thad argues that the circuit court improperly relied on the fact that he and his family told Bonnie the wedding would not take place unless she signed the MPA. Thad cites *Gardner*, where this court stated: "A party's statement requiring an MPA as a condition of marriage is not coercion. The other party is free to leave the relationship if an agreement is objectionable." *Gardner*, 190 Wis. 2d at 233. Again, however, *Gardner* is materially distinguishable. Unlike this case, *Gardner* did not involve a party signing an MPA while three

13

months pregnant, without legal representation, and without a full understanding of the MPA's terms.

¶33    For these reasons, we reject Thad's argument that the circuit court erroneously exercised its discretion by concluding that Bonnie did not voluntarily and freely sign the MPA.  Accordingly, the court did not err by determining that the MPA was inequitable and, therefore, unenforceable.

## II.  Inclusion of Thad's Interest in the LLC in the Marital Estate

¶34    Thad next argues that, having set aside the MPA, the circuit court further erred by including his 25% interest in the LLC in the parties' marital estate.  It is undisputed that Thad acquired his interest in the LLC as a gift from his parents before the parties' marriage.  As a general rule, property acquired by a party either before or during the marriage through inheritance or "[a]s a gift from a person other than the other party," "shall remain the property of that party and is not subject to a property division" at divorce.  WIS. STAT. § 767.61(2)(a).[5]

¶35    Nevertheless, inherited or gifted property "must retain its character and identity if its exempt status is to be preserved."  ***Krejci***, 266 Wis. 2d 284, ¶31.  "Character addresses the manner in which the parties title or treat the exempt assets," and "[c]hanging the character of individual property can serve to transmute it to marital property."  ***Id.***  Identity, in turn, "addresses whether the asset has been preserved in an identifiable form so that it can be meaningfully

---

[5] WISCONSIN STAT. § 767.61(2)(b) provides that a court may divide inherited or gifted property "if the court finds that refusal to divide the property will create a hardship on the other party or on the children of the marriage."  The circuit court did not make such a finding in this case, and Bonnie does not argue that § 767.61(2)(b) is applicable here.

14

valued and assigned." ***Id.*** While commingling of inherited or gifted property and marital assets "is not necessarily fatal to the exempt status," a court must ask whether the inherited or gifted asset "can nonetheless be identified," despite the commingling. ***Id.***

¶36 "The party seeking exclusion of inherited or gifted property [from the marital estate] must prove that [the property] has retained its character and identity." ***Id.***, ¶32. The other party then "has the opportunity to establish by sufficient countervailing evidence" that the property has "lost its exempt status because its character or identity has not been preserved." ***Id.***

¶37 The determination of whether property is divisible under WIS. STAT. § 767.61(2)(a) "involves both fact finding and legal questions." ***Derr v. Derr***, 2005 WI App 63, ¶10, 280 Wis. 2d 681, 696 N.W.2d 170 (applying a prior version of the statute). As noted above, a circuit court's factual findings will be upheld on appeal unless they are clearly erroneous. *See **Covelli***, 293 Wis. 2d 707, ¶13. Questions of law, however, are reviewed de novo. ***Id.***

¶38 Here, the circuit court correctly relied on our decision in ***Krejci*** to determine that Thad's interest in the LLC should be included in the marital estate and subject to division. In ***Krejci***, John inherited a resort property from his first wife before marrying his second wife, Kathleen. ***Krejci***, 266 Wis. 2d 284, ¶3. Following the parties' marriage, Kathleen worked in nursing homes in the winter months but ran the resort with John during the summer months. ***Id.***, ¶7. Specifically, Kathleen testified that she and her children from a prior marriage "cleaned cabins and boats, attended to guests, did yard work, sold bait, did laundry and in general helped run the resort." ***Id.*** Kathleen was not paid for her work at

15

the resort. *Id.* She testified that the resort business "steadily improved over the years." *Id.*

¶39 John disputed the amount of work that Kathleen did for the resort but conceded that she "did the resort's laundry." *Id.*, ¶8. He opined that the resort's value had increased during the marriage because of the increased value of the lakeshore property, not because of any contributions by Kathleen. *Id.*, ¶10.

¶40 The circuit court recognized that the resort was John's inherited property. *Id.*, ¶15. Nevertheless, the court concluded that Kathleen was entitled to a portion of the resort's appreciated value because "the resort's appreciation was due to a large degree to the efforts of both parties." *Id.*, ¶¶15, 25.

¶41 On appeal, we affirmed the circuit court's decision to include the resort's appreciation in the parties' marital estate. *Id.*, ¶34. We explained, "[I]f it is shown that inherited property has appreciated in value during the marriage due to the efforts of both the owning and nonowning spouses, that appreciation will be included in the marital estate." *Id.*, ¶33 (citing ***Richmond v. Richmond***, 2002 WI App 25, 250 Wis. 2d 647, 640 N.W.2d 220). We then noted that "the parties' income and labors were invested in the resort, and evidence fails to demonstrate how their added investment can be specifically traced and identified." *Id.* In addition, we rejected John's argument that the resort should not be included in the marital estate because title to the resort still remained in a trust and had never been transferred to Kathleen. *Id.*, ¶34. We noted that "[w]hile a change in the title from sole to joint ownership affects the character of the property, maintaining separate title is not dispositive." *Id.* (citation omitted).

¶42 In this case, the circuit court found that Bonnie made significant, unpaid contributions to the LLC during the parties' marriage. Specifically, the

court found that Bonnie worked for the LLC "during the pendency of the marriage," that she was not paid for approximately the first eight years of the marriage, and that the LLC began paying her only "after she raised a concern about her not contributing to her Social Security account." The court reasoned, "The fact that she was placed on the payroll upon request allows the inference [that] her unpaid contributions were not insignificant." The court also found that it was undisputed that Bonnie's work for the LLC included cleaning apartments, removing snow, depositing checks, showing apartments, mowing lawns, being on-call when Thad's parents were out of town, and performing significant tiling work. The court found that Bonnie's tiling work, in particular, "went beyond mere routine and maintenance of [the LLC]."

¶43    The circuit court further found that there was "no question" that the value of Thad's 25% interest in the LLC had "increased dramatically during the years of the marriage." Additionally, the court found that "[t]he evidence shows that the growth of [the LLC] was truly a family effort. All members of the family contributed to the growth of [the LLC]. The women's contributions were equal, if not greater, than the contribution of the male family members." More specifically, the court found that "[t]he increased value of [the LLC] was due to the efforts of all family members, including Bonnie."

¶44    Based on these findings, the circuit court determined that, similar to the circumstances in *Krejci*, "the parties' labor was invested in [the LLC] and there exists no way to determine how that investment could be specifically traced and identified." None of the court's factual findings are clearly erroneous. We

17

agree that, based on those findings and our reasoning in *Krejci*, the court properly included Thad's interest in the LLC in the parties' marital estate.[6]

¶45    Thad argues that the evidence presented at trial shows that the LLC's "character" was maintained throughout the marriage because the title to Thad's interest in the LLC never changed.  Notably, however, the *Krejci* court rejected an identical argument, observing that "maintaining separate title is not dispositive." *Id.*

¶46    Thad also argues that his 25% interest in the LLC maintained its identity as gifted property because it "was preserved throughout the marriage" and "could be identified at trial."  This argument ignores the circuit court's findings that the value of Thad's interest in the LLC increased significantly during the parties' marriage and that the increase "was due to the efforts of all family members, including Bonnie."  Based on these findings, the court properly determined that, as in *Krejci*, the parties' respective contributions to the value of Thad's interest in the LLC could not be traced or identified.  *See id.*, ¶33.

¶47    Thad further argues that the circuit court should have considered "what caused the increase in value of [the LLC]—the ongoing financial

---

[6] We acknowledge that both *Krejci v. Krejci*, 2003 WI App 160, ¶24, 266 Wis. 2d 284, 667 N.W.2d 780, and *Richmond v. Richmond*, 2002 WI App 25, ¶7, 250 Wis. 2d 647, 640 N.W.2d 220, state that where gifted or inherited property has appreciated in value during the marriage due to the efforts of both spouses, the *appreciation* will be included in the marital estate. Here, the circuit court included the value of Thad's entire 25% interest in the LLC in the marital estate, not just the appreciation that occurred during the parties' marriage. On appeal, however, Thad does not develop any argument that the court erred by including the *entirety* of his interest in the marital estate, as opposed to only the appreciation, and we note that he did not raise this argument in the circuit court, including in his motion for reconsideration. We will not abandon our neutrality to develop such an argument on Thad's behalf. *See Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82.

investment and strategy of Thad's parents or the familial approach in dealing with nominal work on the property." This argument fails for two reasons. First, it ignores the circuit court's finding—which is not clearly erroneous—that Bonnie performed significant, not merely nominal, work for the LLC. Second, Thad points to no evidence showing that the LLC's increased value was due to his parents' "ongoing financial investment and strategy," as opposed to work performed by Bonnie or other family members. As noted above, it was Thad's burden to prove that his interest in the LLC "retained its character and identity." *See id.*, ¶32.

¶48     Finally, Thad asserts that the circuit court "failed to find that [he] possessed the requisite donative intent to transmute the character of [the LLC] during the marriage." *See Derr*, 280 Wis. 2d 681, ¶23 (stating that "the 'character' inquiry involves no more and no less than determining whether the owning spouse intended to donate non-divisible property to the marriage, that is, did the owning spouse have donative intent"). Thad argues that "the relevant inquiry here is whether Thad, as the minority-owning spouse, intended to donate [the LLC] to the marriage," and he claims that there was "no evidence at trial that would support such a finding." He further argues that, given his "limited ownership interest and role in the business, [he] would have been unable to donate [the LLC] to the marriage."

¶49     This argument is unavailing because the relevant inquiry is whether Thad had donative intent with respect to *his 25% interest in the LLC*, not the entire LLC. Thad cites no legal authority in support of the proposition that he lacked the ability to donate *his own interest in the LLC* to the marriage. In addition, while Thad cites his own testimony that he never intended Bonnie to "become an owner of [the LLC]," the circuit court was not required to accept his testimony in that

19

regard. *See* ***State v. Peppertree Resort Villas, Inc.***, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345 ("When the circuit court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and the weight to be given to each witness's testimony."). Instead, the court could infer Thad's donative intent based on his treatment of the asset during the marriage—namely, his allowing Bonnie to perform significant work for the LLC without compensation, as well as the shared benefits that both parties received from the LLC during the marriage, such as the LLC paying for childcare expenses, providing a vehicle for Thad to use, and reimbursing the parties for their taxes.

¶50 For these reasons, Thad failed to meet his burden to show that his 25% interest in the LLC "retained its character and identity" as gifted property. *See* ***Krejci***, 266 Wis. 2d 284, ¶32. Consequently, the circuit court properly determined that, under ***Krejci***, Thad's interest in the LLC should be included in the parties' marital estate and subject to division.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

20